NATIONAL GRINDING WHEEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 110089. Promulgated June 26, 1947.

*Frank J. Maguire, Esq., Edward N. Mills, Esq.,* and *James Heffern, Esq.,* for the petitioner.

*Harold D. Thomas, Esq.,* and *Lawrence F. Casey, Esq.,* for the respondent.

OPINION.

Murdock, *Judge*: Section 722 allows relief from excess profits tax in certain cases through substitution of a constructive average base period net income for the actual earnings of that period. The general rule of 722 (a) is that a taxpayer which establishes that its excess profits tax is excessive and discriminatory and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, may have its tax computed by using the constructive average base period net income instead of its actual average base period net income. It is provided in (b) (4) that the tax shall be considered to be excessive and discriminatory if the taxpayer's average base period net income is an inadequate standard of normal earnings because the taxpayer changed the character of its business during the base period and the average base period net income does not reflect the normal operation for the entire base period. It further provides that "change in the character of the business" includes "a difference in the capacity for production." This petitioner substantially increased its capacity for production during the base period. The maximum capacity of its ovens at the end of the base period was about three times what it was at the beginning of the base period. The maximum capacity of its kilns at the end of the base period was about 50 per cent more than it was at the beginning of the period. Thus, the petitioner has established that there was a "change in the character of the business" during the base period within the meaning of those words as used in section 722 (b) (4).

The petitioner calls attention to the Ford agreement for one purpose only, and that is to show that there was a change in the character of its business on December 31, 1939, within the meaning of section 722 (b) (4), as a result of a course of action to which it was committed prior to January 1, 1940, under the agreement with Ford. It is not necessary to decide that question in view of the finding that there

was a change in the character of the business by reason of an increase in capacity *during* the base period, and no claim is made, or ever has been, for the application of the push back rule to the Ford sales.

The next question is whether the average base period net income is an inadequate standard of normal earnings because of the change in the character of the business. This, as the petitioner recognizes, is the most important question in this case. The following statement of the petitioner's contention is taken from its reply brief:

Fundamentally, the petitioner's contention is that if it had [had] 1939 capacity all through the base period years, it would have sold in each of the base period years substantially more than it actually sold.

It is true that the heating process could not be shortened. It claims that its kilns and ovens formed a "bottleneck" during the base period years which limited its production and sales, and, if it had not been so restricted by that limitation upon its capacity, more finished goods could have been manufactured, handled, and sold by the other parts of its organization. Unless there is sufficient reason to believe that greater capacity in each year of the base period would have resulted in greater sales in each, then there is no reason urged for using other than actual earnings for that year. The petitioner suggests, as the final step, that "a fair and just amount representing normal earnings" is a constructive average base period net income based upon its actual sales, either for the last three months or for the last six months of 1939, upon the theory that, if it had had the capacity throughout the base period which it had at the end of that period, it would have captured as much business throughout that period as it actually captured during the last three months or during the last six months of the period. It is not asking that sales to Ford after December 31, 1939, be considered.

The business of the petitioner was not new during the base period, but was then well established. The present management had taken over in 1923. The evidence shows that the management and sales force were aggressive and were doing everything which they could to make sales and to obtain additional business all during the base period. The petitioner was doing better than most of its competitors in obtaining and retaining customers during those years. It was increasing its capacity as it saw the need therefor.

However, the petitioner was not able to sell during 1936 as much merchandise, despite the earnest efforts of its salesmen, as it could have produced in that year without overtaxing its capacity or as it actually produced. Its kilns and ovens were not operated at full actual capacity during that year and sales for the year did not equal actual production. Inventories of finished goods increased. The evidence shows also that the petitioner was building kilns and ovens

just as fast as need for them appeared. It had sufficient funds at all times during the base period with which to build such additional kilns or ovens as it deemed necessary. The president of the petitioner testified that it needed an office building in 1936 more than it needed kilns. It built some additional ovens during 1936. The record as a whole does not justify the conclusion that a lack of capacity to produce restricted sales during 1936 or, to state it differently, that the petitioner's sales for that year would have been larger if its capacity had been substantially greater.

It is quite apparent, and one of the officers of the petitioner conceded, that the petitioner's profits from about September 1937 until some time in 1939 were limited by its ability to sell its product and not by its ability to manufacture. Its sales for that period fell below what they had been previously, showing clearly that the petitioner then had capacity to produce more goods than it could sell. Business improved in the latter part of 1939. Just how much of the improvement was due to the stimulus of war does not appear. The petitioner seeks to use its earnings for the latter part of 1939 as a basis for reconstructing its earnings for the earlier period. It seems satisfied with late 1939 earnings and it makes no claim that they should be increased in arriving at constructive net income. It did not sell as many pounds of wheels in 1939 as it had produced in 1937, even though 1939 capacity exceeded that of 1937. The petitioner's actual earnings for 1936, 1938, 1939, and the first and last three months of 1937 were an adequate standard or measure of its normal earnings.

The above discussion covers the entire base period except for six months of 1937. That was a busy period. Two or three witnesses, key employees or officers of the petitioner, expressed opinion that the petitioner could have made some additional sales during the base period or portions thereof if it had had greater capacity for production. Other evidence shows that this was unlikely except for a part of 1937. There was also a statement by one of this same group that the petitioner was unable to make deliveries on orders with its usual promptness during all or some part of the first nine months of 1937 and prospective customers gave to competitors some orders which the petitioner might have received if the customers could have been assured of prompt deliveries. Ordinarily, a kiln must be allowed to cool after a firing before workmen can unload it and reload it for a new firing. There is testimony that the kilns were not only being used to capacity during some part or all of the first nine months of 1937, but that the unloading operations were begun one day sooner during that period than would have been the case under ordinary operations. The actual production for 1937 was slightly in excess of 80 per cent of the maximum theoretical capacity for the year. The

petitioner regarded 80 per cent of that maximum as good production, taking into consideration repairs, breakdowns, and the necessary cooling periods between firings of kilns. Still inventories of finished goods increased in 1937. It seems fair to conclude from the entire record that the petitioner probably would have made some additional sales during the spring and summer of 1937 if it had had some additional capacity at that time. This is the strongest point in the petitioner's case.

This record does not show with any clarity how much the petitioner's income for 1937 might have been increased if it had had ample capacity in that year to enable it to make prompt deliveries. The situation which developed at that time was apparently only a temporary one, such as might be expected in any business, and perhaps no relief should be granted. The record does not show the volume of sales which was lost or that it was substantial. If the petitioner had had additional kilns and ovens in 1937 when it had some need for them, it would have had additional depreciation in that year and perhaps also in 1938 and 1939, with the result that its average constructive base period net income would not have been increased 100 per cent by the income from the lost sales of 1937. This record does not justify a holding that the constructive average base period net income exceeded actual average base period net income by more than $2,000, but, following the principle of *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, the finding is hereby made that a fair and just amount representing normal earnings for the base period to be used as a constructive average base period net income is $2,000 more than actual average base period net income.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*