OPINION. Raum, Judge: In these proceedings petitioner appeals from respondent’s denials in toto of its applications for excess profits tax relief under section 722 of the Internal Revenue Code[6] for the years 1942, 1943, 1944, and 1945. Petitioner was organized in 1909 under California law, and during the intervening years has been engaged as a public utility in generating, transmitting, and distributing electric energy in southern California to domestic, industrial, commercial, and municipal purchasers. Its facilities for generating electricity were in part hydroelectric, or operated by waterpower, and in part were powered by steam. In the conduct of its business, petitioner was subject to regulation by the state utilities commission. The Boulder Canyon Project Act became law on December 21,1928. It provided for the construction of Boulder Dam, and authorized an appropriation of $165,000,000 for that purpose, with a prohibition against use of such funds until the Secretary of the Interior had in effect made suitable contractual provision for repayment to the United States within 50 years of all costs and expenses incurred. Such contracts were in fact executed on April 26,1930, petitioner being a party to one of them. The power to be generated at Boulder was allocated by the United States not only to the Metropolitan Water District but also to petitioner and other named allottees, including the City of Los Angeles, which operated a municipally owned system for the distribution and sale of electricity. Work on the dam was thereafter promptly commenced, and by 1935 it was ready to start impounding water. The first generator went into full operation in October 1936; by that time the City had completed a transmission line to Boulder, and began to receive the power thus generated. The City had previously obtained its power from petitioner, and it was recognized at the time the 1930 contracts were executed that, when the City began to take power from Boulder, petitioner as a consequence would have surplus power on its hands; petitioner was accordingly allowed in substance a period of three additional years within which to recoup its lost business before being required to take its share of Boulder power. Although the City actually began to receive Boulder power in 1936, it was not obligated to do so under its contract until June 1, 1937; and, accordingly, petitioner was not required to take its share of Boulder power prior to June 1, 1940. The advent of Boulder power plays a dual role in petitioner’s claim to relief under section 722. On the one hand, petitioner lost Los Angeles and two other cities (Burbank and Glendale) as customers relatively early in the base period as a consequence of Boulder; it contends that its business during the base period was depressed by reason of that fact, and it seeks relief under section 722 (b) (1) and (b) (2). On the other hand, petitioner had committed itself by contract in 1930 to take power from Boulder, which power it actually received and sold during the taxable years; it contends that normal earnings from such power were not reflected in its average base period net income, and it seeks relief on that account under section 722 (b) (4). Two additional grounds for relief are unrelated to the foregoing; they grow out of certain deductions for depreciation and interest, and are asserted under section 722 (b) (5). I Loss of the Three Oities — Section 7W (6) (1) amd (&) (£). The territory served by petitioner included the cities of Los Angeles, Burbank, and Glendale, and prior to 1918 petitioner sold electricity at retail to consumers in those cities. Thereafter each of those cities acquired petitioner’s distribution facilities located within it. But petitioner’s sales in respect of those cities did not cease; from 1923 through 1936 the cities bought electricity from petitioner at wholesale for redistribution through their municipally owned systems. The electricity to be generated at Boulder Dam was allocated in part to these cities in 1930. In 1936,- when facilities were completed for generating and transmitting Boulder power to the City of Los Angeles, it ceased most of its purchases from petitioner; however, petitioner did continue to sell some power to the City and in addition received an annual rental of $575,000 for the lease of a 60,000 kilowatt steam plant to the City for each of the years 1937 through 1947. The cities of Burbank and Glendale similarly discontinued the greater part of their wholesale purchases from petitioner in 1937, when they began to receive Boulder power.[7] As noted above, it was contemplated that the productive capacity, of petitioner that would be freed because of the shift by these cities (particularly Los Angeles) from petitioner’s power to Boulder power, would be in such quantity that it would take up to 3 years to find other purchasers for such power, and it was for this reason that petitioner was not required by its 1930 contract to start receiving Boulder power until 3 years after Los Angeles was obligated to do so. On July 1, 1939, petitioner sustained a further loss of customers, sometimes referred to as “fringe customers.” On that date, under threat of condemnation, petitioner sold to the City of Los Angeles that portion of its distribution system in territory which had been annexed to the City but which petitioner had served for many years. The sale resulted in a loss of 53,449 customers. As part of the same transaction, petitioner purchased certain distribution facilities located outside the City, thereby acquiring 9,745 customers formerly served by the City. The end result of the transaction to petitioner was a net loss of 43,704 customers and approximately $1,500,000 in annual revenues. The loss of the cities’ business and the lag in replacing it, and the loss of the fringe customers, are asserted by petitioner to entitle it to relief under subsections (b) (1) and (b) (2). We agree that petitioner meets the requirements of at least one of these provisions. To come within (b) (1), the average base period net income must be an inadequate standard of normal earnings because during base period years “normal production, output or operation was interrupted or diminished because of the occurrence * * * of events unusual and peculiar in the experience” of the taxpayer. Under (b) (2), so far as it applies here, it is required that the average base period net income be an inadequate standard of normal earnings because during the base period the taxpayer’s business “was depressed because of temporary economic circumstances unusual in the case of such taxpayer * * In general, (b) (1) deals with physical events which produce the required consequences, whereas (b) (2) deals with economic events which cause the consequences involved. Cf. H. Rept. No. 146, 77th Cong., 1st Sess., p. 12; S. Rept. No. 75, 77th Cong., 1st Sess., p. 12; H. Rept. No. 2333, 77th Cong., 1st Sess., p. 143; Treasury Regulations 112, section 35.722-3 (a);[8] Matheson Co., 16 T. C. 478, 486; Granite Construction Co., 19 T. C. 163, 169. Petitioner argues that (b) (1) is applicable because the loss of the cities, which appears to be an economic event, was caused by construction of Boulder Dam, alleged to be a physical event sufficient to result in compliance with (b) (1). However, it is unnecessary to rule on the question, since petitioner relies on the same circumstances for relief under both (b) (1) and (b) (2), and has available to it under the latter all the relief to which it might be entitled under the former.[9] We examine, therefore, the claim for relief as made under (b) (2). Respondent objects, first, that the loss of the cities’ business and of the fringe customers was not unusual for petitioner, in that since 1918 petitioner had lost business because of municipal operation of power systems. Our findings make it clear, however, that the loss of business, incurred in 1936 and 1937 because of the cities’ transfer to Boulder power, was so great that it was surpassed only by the loss incurred by petitioner in or .about 1918 when it had to dispose of its distribution facilities in Los Angeles under threat of condemnation. While it is true that petitioner did lose customers to municipally operated power systems during a number of years prior to 1936, such losses were small in comparison with the losses of 1936 and 1937. Somewhat the same observation may be made about the net loss in, fringe customers in 1939; this resulted in a loss of annual gross revenue amounting to about $1,500,000, and the record fails to show any prior losses at least since 1919 even remotely approximating this magnitude. The (b) (2) requirement that the temporary economic circumstances be “unusual” is comparable to the (b) (1) condition that the qualifying events be “unusual and peculiar” in the experience of the taxpayer. Certainly, (b) (1) is no less stringent in this connection than (b) (2). And we think that the meaning of this condition has been correctly explained in the Bulletin on Section 722 (p. 11): Cases involving this question may be classified into three groups.’ First, there will be those eases in which section 722 (b) (1) is clearly applicable because the event has never before been encountered by the taxpayer or has happened at such infrequent intervals that its occurrence during the base period constitutes a clear distortion of average base period net income. At the other extreme will be those cases in which section 722 (b) (1) is not applicable because the event is an ordinary and expected hazard of the business, occurring with such frequency that its presence is to be expected in any 4-year period. Between these two extremes will be those cases in which the event is not unique in the taxpayer’s experience but has occurred with such frequency or severity during the base period as to render the actual average base period net income an inadequate standard of normal earnings. If the event causing the interruption was of such severity or duration as to constitute it a different kind of event, section 722 (b) (1) should be considered applicable. * * * The record makes it plain to us that the loss of the 3 cities in 1936 and 1937 and the loss of the fringe customers in 1939 were of such severity that they were “unusual” within the meaning of the statutory provisions. Respondent further objects that (b) (2) is inapplicable because the loss was not “temporary.” He points to the fact that to the extent that the cities undertook to buy their power at Boulder they were lost permanently as customers of petitioner. Petitioner argues, however, that “the question is not whether a particular customer is lost forever; rather, the issue is whether the taxpayer’s earning capacity is permanently decreased by the loss of the customer or whether such earning capacity can be replaced by sales to others.” In this connection, petitioner reminds us that the very reason it was not required to begin to take its own share of Boulder power until 3 years after the shift of Los Angeles to Boulder power was to enable it to replace the lost load by increasing its sales to others without being burdened meanwhile by excess capacity attributable to Boulder. We think that respondent’s contention takes an unduly narrow view of (b) (2), and that the petitioner’s position is more in accord with the basic purpose of the statute. Indeed, section 35.722-3 (b) of Regulations 112, after discussing the meaning of the word “temporary,” provides an example which goes far to sustain petitioner’s position: An example * * * might be a taxpayer which for a long period of years conducted business with one customer which it lost during the base period because such customer decided to manufacture for itself the product it had formerly bought from the taxpayer. The taxpayer would be compelled to develop a new market. The average earnings of the taxpayer for the period of time during which the taxpayer was engaged in obtaining new customers would not represent an adequate standard of its normal earnings and would be sufficient cause for the establishment of a constructive average base period net income under section 722. This example also appears in the committee reports which considered the bill that became the Revenue Act of 1942. See H. Rept. No. 2333, 77th Cong., 1st Sess., p. 143; S. Rept. No. 1631, 77th Cong., 1st Sess., p. 199. In the circumstances, we accept it as a correct interpretation of the statute, and we are unable to see any significant distinction between the example and the case at bar. We hold that the loss of the 3 cities and the fringe customers are within the provisions of (b) (2). In making correction for the depression in petitioner’s earnings during the base period by reason of its loss of the 3 cities and the fringe customers, certain limiting considerations must be given effect. In the first place, petitioner did continue to sell some power in relatively small quantities to the 3 cities even after their shift to Boulder; therefore, an adjustment must be made for such sales, as well as for the $575,000 annual rental which petitioner received from Los Angeles by reason of the lease of the 60,000-kilowatt steam plant. Secondly, petitioner’s lost sales to the 3 cities were sales at wholesale. Respondent argues that petitioner did not make any profit on such sales and indeed lost money on them. We cannot agree with respondent, and are satisfied on the record that such sales were profitable. However, we are also satisfied that they were far less profitable than sales which petitioner made to other customers, particularly retail consumers. Accordingly, the fact that such sales were among the least profitable of all of petitioner’s sales must be taken into account in correcting the abnormality caused by the loss of the 3 cities. Thirdly, the record convinces us that the loss occasioned by the shift of the 3 cities to Boulder power was fully recouped by the middle of 1939, and that there was partial and steadily growing recoupment between 1937 and the middle of 1939. Consequently, an appropriate adjustment must be made for this fact. To be sure, petitioner argues that in determining relief we must proceed as though the cities had not been lost at all, and that the growth that it otherwise enjoyed is to be superimposed over the earnings from the cities which it lost. And indeed there are general statements in the regulations and the Bulletin on Section 722 to the effect that the qualifying events should be eliminated so that net income for the base period may be computed as though such events had not occurred.[10] But the difficulty in applying those general statements in the context of this case is that the growth which petitioner attained between 1937 and the middle of 1939 was pro tanto regarded merely as a replacement for the business of the cities which it lost. Otherwise, petitioner could not have qualified for relief under (b) (2) at all, since the loss would not have been a temporary one, as required by the statute. Petitioner cannot have it both ways. If, in order to qualify under (b) (2), it establishes that the increase in sales to others after the cities’ shift to Boulder power was merely a replacement of the cities’ business and that it therefore satisfies the “temporary” requirement, it cannot at the same time successfully maintain that such increase in sales would have occurred anyhow and that it is entitled to a reconstruction that assumes not only the continuance of the cities as customers but also the growth that was regarded as replacing the loss of the cities. Petitioner’s relief in this connection must be measured by the conditions which entitle it to relief in the first place. Fourthly, in eliminating the abnormality caused by the loss of approximately $1,500,000 in annual revenues from the fringe customers, we must take into account that the loss occurred on July 1, 1939, and tbat only the earnings for the second half of 1939 require correction as to this factor. However, the sales which petitioner thus lost were in large part to retail customers, its most profitable type of business, and in adjusting petitioner’s earnings for the loss of the fringe customers we must give it the benefit of this fact. II Increased Capacity as a Result of Commitment to Take Boulder Power — Section 7M (5) (4). As a further basis for relief petitioner contends that by reason of its 1930 contract it was committed to begin taking Boulder power on June 1,1940, and that normal earnings from such increased capacity were not reflected in its average base period net income. It relies upon section 722 (b) (4). In so far as those provisions apply here, a taxpayer qualifies for relief under (b) (4) where it is shown that its average base period net income is “an inadequate standard of normal earnings” because the taxpayer “changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business.” A change in the character of the business is defined to include “a difference in the capacity for production or operation,” and is required to take place during or immediately prior to the base period; however, if such a change is “consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940,” it is “deemed to be a change on December 31, 1939.” Moreover, in its so-called push-back rule, (b) (4) provides that “If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer * * * had made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time.” Where the taxpayer shows that it otherwise complies with the statute, it must also establish, to be entitled to relief, a constructive average base period net income to be used in lieu of its average base period net income computed without the benefit of section 722. The parties" are agreed that petitioner “did have a valid commitment under Section 722 (b) (4) of the Internal Revenue Code for increased capacity for production because of its contract for Boulder power,” and there is no dispute that a requisite change within (b) (4) occurred. However, respondent’s principal contention, in contesting petitioner’s claim to relief under (b) (4), is that the additional capacity represented by petitioner’s commitment for Boulder power would not in fact have resulted in additional earnings had it been available during the base period, and that therefore the commitment did not render petitioner’s average base period net income an inadequate standard of normal earnings. 1. We are met at the outset of this point with a sharp disagreement between the parties as to the scope of relief provided by (b) (4). Petitioner argues, in substance, that in commitment cases effect must be given to additional earnings which the taxpayer normally might expect to derive in years following the base period as a result of the change consummated after the base period. Its position is that a projection is to be made “as of” the end of the base period, of the additional earnings that it might reasonably expect in the subsequent years from the increased capacity for which it had committed itself. Petitioner refers to this approach at times as a “projective type mechanism.” Eespondent, on the other hand, contends that there is no warrant in the statute for such a technique, and that relief is permissible only to the extent that petitioner can show (either with or without the push-back rule) that the additional capacity would have meant increased earnings to the taxpayer during the base period or by the end of the base period. We agree with respondent that there is no statutory justification for petitioner’s “projective type mechanism,” and that it is indeed contrary to the general framework and purpose of the statute. Certainly, in noncommitment (b) (4) cases it is clear that where increased capacity is the basis for relief the pivotal inquiry is whether such increased capacity would have resulted in increased earnings during the base period. Cf. National Grinding Wheel Co., 8 T. C. 1278; Green Spring Dairy, Inc., 18 T. C. 217; Schneider's Modern Bakery, Inc., 19 T. C. 763. And we have applied the same test where the increase in capacity was attributable to a (b) (4) commitment. Studio Theatre Inc., 18 T. C. 548, 567. The selection of the years 1936 through 1939 as the base period reflects a legislative judgment that economic conditions were generally normal at that time and that excess profits due to the war in the years which followed could be determined by comparing the earnings of the war years with those of the base period. However, Congress recognized further that there might be certain abnormalities in the base period itself, and, by section 722, it undertook to provide the means for correcting such abnormalities. But the dominant consideration that must not be overlooked is that the corrections allowed by section 722 are to be made within the framework of the base period itself. The constructive average base period net income which is authorized by the statute represents net income determined for the hose period, after making the permissible adjustments for the abnormalities. Normal earnings cannot be determined in the abstract; they must be related to an economic environment. And Congress has selected the base years 1936 through 1939 as furnishing that economic environment. Petitioner’s “projective type mechanism” would determine normal earnings in terms of income that might be received in post-1939 years merely because such earnings might be foreseeable as of the end of 1939. This would be wholly inconsistent with the theory underlying section 722. Petitioner stresses the fact that it is relevant in a (b) (4) case to take into account its “prospects” as of the end of the base period. Of course, in applying the push-back rule, it may be appropriate to consider prospects as of the end of 1939 in determining what the taxpayer’s level of earnings would have been at that time had it had the advantage of two years’ additional experience prior to that time. But that is a far cry from saying that a constructive average base period net income may be determined on the strength of growth that was expected for the years following the base period, irrespective of whether the desired earnings would have been attainable during or by the end of the base period. Cf. Fishbeck Awning Co., 19 T. C. 773. In support of its position, petitioner points to the last sentence in section 722 (a), which in' general forbids.the use of post-1939 events in determining constructive average base period net income but, in commitment cases, provides that “regard shall be had to the change in the character of the business under section 722 (b) (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.” We find nothing in these provisions that justifies petitioner’s contention. The very nature of a commitment case involves changes consummated after the base period, and of necessity one would have to consider such post-1939 events in order to make the statute effective. We need not decide here what additional post-1939 events, if any, may be taken into account, but it is clear that those post-1939 events that may be considered must be used only to the extent that they are necessary to determine “normal earnings to be used as the constructive average base period net income.” (Italics supplied.) The statute contains no authorization to determine “normal earnings” generally in commitment cases, unrelated to the base period, and the legislative history of the provision fails to establish that Congress intended any such unusual result.[11] In the absence of a clear indication of a contrary purpose, we cannot believe that Congress meant to exclude the influence of foreseeable post-1939 profits where a change in the business was completed in December 1939, but wanted it taken into account where the change was consummated in January 1940. Were projection of expected earnings desirable in the latter case, it would be so in the former as well; and we cannot assume that Congress acted inconsistently for these situations. Petitioner professes to find authority for its position in the so-called variable credit rule. See Regulations 112, section 35.722-3 (d) (5). We think that rule is of no aid to petitioner. For the corrections required by the variable credit rule are merely adjustments with respect to constructive earnings that are otherwise computed with reference to the base period. The very basis for applying the variable credit rule is a determination of normal earnings in relation to base period conditions, which are then merely scaled down for the taxable year because the conditions that create the right to relief are not expected to be or are not yet in fact fully operative during the taxable year. That situation is entirely different from the present case where petitioner presses upon us a determination of “normal earnings” completely unrelated to the base period merely because, as of the end of that period, they can be foreseen as attainable in future years. The variable credit rule deals with earnings (or a portion of such earnings) which could have been realized by the taxpayer during the base period if the abnormality giving rise to relief were corrected; petitioner’s “projective type mechanism,” on the other hand, deals with earnings that are expected in later years. We cannot accept petitioner’s “projective type mechanism” as a permissible method of determining relief under (b) (4). 2. In the alternative, petitioner contends that even if it is in error in its interpretation of the statute, discussed above, it is nevertheless entitled to relief under (b) (4) because, applying the familiar 2-year push-back rule, it would have been able to find a profitable market for the additional power that it had committed itself to take. It presented a considerable amount of evidence in an attempt to support that position. Petitioner undertook to show that it actually lost sales or deliberately surrendered opportunities to make sales during the base period by reason of insufficient capacity. We have studied the record with great care and are satisfied that such was not the fact, apart from a possible sale of one unusually large block of power (based upon 100,000 kilowatts) to the City of Los Angeles which will be discussed separately. We are convinced that petitioner did not curtail its sales efforts during the base period, and that it did not deliberately fail to develop sales opportunities that it would otherwise have exploited. The bulk of the evidence which bore directly on this issue consisted of the testimony of Henry C. Rice, petitioner’s sales manager. Petitioner sought to show, through Rice, that during the base period, because of alleged insufficient productive capacity, it either abandoned or relaxed or refrained from instituting certain programs for stimulating sales. Rice’s testimony was not convincing. He told of various “plans” for promoting sales that he submitted to petitioner’s management and which, he said, were rejected. However, there was not introduced any written or documentary evidence of such “plans,” their submission, or disposition. One of these plans was said to involve the rental of electric ranges to householders at $1.50 a month, thereby stimulating the use of electric power. It turned out that such a program had once been tried by petitioner in 1983 for a single day. We are left with considerable doubt whether the management’s refusal to proceed with that plan at a later time and its refusal to adopt other plans in which petitioner would undertake to press the sales of certain electric appliances were in any way motivated by any potential shortage of power. Other reasons for such refusals too readily suggest themselves. For example, to the extent that petitioner would sell appliances or place them in the consumer’s home, it would be competing with dealers in the area, and it was important to petitioner not only to retain the good will of the dealers but also, as Eice himself recognized, “to keep our dealers alive and keep them going and keep them solvent.” Moreover, manufacturers and dealers themselves promoted sales of such products, and there is no evidence in the record at all that the dealers or manufacturers in any way curtailed their own advertising or promotional efforts to sell electrical appliances. There is nothing in evidence that persuades us that, so far as the kind of activity involved in these “plans” is concerned, petitioner’s conduct prior to the base period when no claim is made that it was suffering from a shortage in power, either actual or potential, was materially different from its conduct during the base period. We cannot conclude, upon the basis of such testimony as was proffered by Eice, that petitioner deliberately curbed its efforts to increase its sales of power by reason of any alleged shortage of power. Moreover, the annual reports which petitioner made to its stockholders point strongly in the other direction. The report for 1935, rendered March 20, 1936, called attention to the loss of the business of Los Angeles, Glendale, and Burbank, which petitioner was about to sustain, and reassured the stockholders by telling them of its “aggressive load building campaign” which was said to have been under way for more than 2 years in order to replace “this low priced wholesale business” with more profitable retail business. The report for 1936, rendered March 19, 1937, recounted the progress that was made in the “new business campaign,” analyzing in some detail the company’s increases in load and the sales of various energy consuming appliances in the area which it served. The report stated further: Our intensive load-building campaign, in progress for three years, touches every activity which goes on in this vast territory. In the year 1937 it will go forward with renewed impetus, and we have reason to believe the results will exceed those of the year just closed. The report for 1937, rendered March 18, 1938, contained no suggestion whatever of any reduced sales efforts. To the contrary, it continued the same note of optimism reflected in the prior reports, and stated that “During the year 1937 we aggressively continued our cooperative load-building campaign, which has shown substantial increases in load each year since the inauguration of the plan in the fall of 1933.” This statement was followed by a quantitative breakdown of the various types of electric appliances sold in petitioner’s territory, and of the increases in its load. The report also noted that the company’s “promotional and sales efforts are reflected in the constant growth in the average kilowatt hour consumption by domestic consumers,” which exceeded the national average, notwithstanding the company’s “competition from cheap natural gas in all of our territory.” The report for 1938, rendered March 19, 1939, called attention to the fact that 1938 was one of recession generally in all lines of business, but that the company’s gross revenues actually exceeded those of the year before, a high record year. The report explained that the company’s showing was “ due primarily to the uninterrupted growth in domestic and commercial sales,” and added: The aggressive new business campaign which the Company has carried on during the past several years, was continued in 1938 and enabled us to add a substantial number of new customers to our lines and to build up the uses of existing customers in the household and commercial classifications. Elsewhere in the same report, the stockholders were told that the company’s largest gain in revenues was the result of increased business from domestic customers, and were reminded of “our continued intensive load-building campaign in the home * * So too, the 1939 report, rendered March 15, 1940, no less than the reports for the prior years, indicated nothing other than a sustained and persistent effort to increase petitioner’s load. Notwithstanding petitioner’s present attempts to explain these reports away, they speak too loudly and persuasively to be ignored. Nothing in those reports suggests that petitioner was merely following a “selective” or a “controlled” load building program, whereby it deliberately sought to dispose of certain blocks of power to another utility (Pacific Gas and Electric) at a low profit rather than to increase the more profitable household consumption. The inference is altogether too plain that, within the limits of good business judgment as petitioner understood them, it was doing everything it reasonably could do to increase the sales of its power and to increase it earnings. The conclusion that we have just reached with respect to the evidence which bore most directly upon this factual issue makes it unnecessary to discuss in detail the great mass of evidence tendered by petitioner that was calculated to establish by inference that it restrained its sales efforts. Petitioner undertook to show in this connection that, without the coming of Boulder power, it was actually faced with a “power shortage” during the last half of 1939, that such shortage was anticipated by the end of 1936, and that, accordingly, it would not have been consistent with prudent management to embark on an “all out” sales program. We have attempted in our findings to set forth fully the facts relating to this matter. One of petitioner’s principal witnesses in his connection was its executive vice president, Harold Quinton, who had not been an officer of petitioner during the base period, and could do little more than guess as to petitioner’s actual sales practices during those years. He stated candidly that “I am unable to testify * * * of my own knowledge, there was any curtailment of sales program in the base period years.” Concerning petitioner’s supply of power, the evidence shows that petitioner had a total productive capacity, on its own generating units, of about 930,000 kilowatts of “rated” or “installed” capacity; out of this capacity, petitioner early in 1937 made available to the City of Los Angeles on a rental basis a steam generating unit of 60,000 kilowatts, thereafter leaving petitioner a rated capacity of about 870,000 kilowatts. However, that rated capacity of 870,000 kilowatts represented, in part, 499,000 kilowatts attributable to its hydro system, and therefore in dry years or in those portions of any particular year when rainfall was low, petitioner could not count upon that amount of power in full. Petitioner’s hydro power consisted in turn of a total of 92,000 kilowatts from so-called stream-flow plants and 397,000 kilowatts from reservoir-supported plants. In the case of the stream-flow plants the power had to be taken advantage of at once as the water moved downstream or it would be forever lost. In the case of its reservoir-supported plants, petitioner could, within limits, impound the water and use it as it was needed. In June 1939, petitioner increased its productive capacity when it began to receive power from an 82,500-kilowatt generator at Boulder, and in September 1939 it began to receive power from its second 82,500-kilowatt generator at Boulder. Through this supply, petitioner had satisfied a demand up to October 1936 which included wholesale purchases by the cities of Los Angeles, Burbank, and Glendale. In 1936, petitioner sold a total of about 567 million kilowatt-hours to those 3 cities. During the same year petitioner’s total sales to other purchasers were about 2,800 million kilowatt-hours, so that the sales to the cities represented about 20 per cent of its total sales in kilowatt-hours. That substantial portion of petitioner’s productive capacity was freed in large part when Los Angeles in late 1936, and the other 2 cities in early 1937, discontinued most of their purchases from petitioner. Since at about the same time Los Angeles began to rent petitioner’s steam plant as previously noted, representing about 7 per cent of petitioner’s total productive capacity, most of the remaining 13 per cent released by the 3 cities became available for future sale. Other data likewise reflect this decline in demand for petitioner’s power. The peak demand — or highest instantaneous demand — for petitioner’s power in 1936 was 645,400 kilowatts; but in 1937 it declined to 580,500 kilowatts, and to 579,000 kilowatts in 1938. Similarly, petitioner’s sales declined from the above-stated quantity of 2,800 million kilowatt-hours to about 2,475 million kilowatt-hours in 1937 and 2,391 million kilowatt-hours in 1938. Petitioner’s peak demand in 1939 occurred at 6:33 p. m. on September 22, and was in the amount of 684,500 kilowatts. If the power from petitioner’s generators at Boulder, which were then in fact in operation, be excluded from consideration, petitioner would have had only 796,500 kilowatts available to it at the moment of that peak, thus leaving a reserve of 112,000 kilowatts at that time. Petitioner contends that a prudent “spinning” reserve (described in the findings hereinabove at pp. 945 and 946) for its system called for 100,000 kilowatts available for instantaneous utilization, and that therefore it was virtually without any extra available power at that moment, leaving Boulder power out of consideration. A sharp controversy has developed between the parties as to whether there was thus in fact a power shortage. We think this is a false issue in this case and do not intend to resolve it, for we do not understand why Boulder power, which in fact became available to petitioner by the last half of 1939, must be excluded from its productive resources at that time. Since 1930 when petitioner contracted for the purchase of Boulder power, it knew that such power would become available to it, and it fashioned its long range plans in reliance upon such power. Moreover, although it was not required to begin taking Boulder power prior to June 1, 1940, it was not precluded from doing so prior thereto; indeed the City of Los Angeles began to receive its share of Boulder power in 1936, some 8 months prior to its mandatory date. By placing its orders for its generators at Boulder petitioner could control and accelerate the time within which it would begin to receive power from Boulder. And the record before us plainly shows that when studies made by petitioner’s engineers towards the end of 1936 indicated the wisdom of obtaining such power during the last half of 1939, petitioner promptly took steps to initiate the construction of its first 2 generators at Boulder. Furthermore, it completed its transmission line to Boulder in 1938, and actually was in position to take advantage of the first generator the moment it was completed in June 1939. True, there were possibilities of delay in construction, but we are satisfied on this record that petitioner was counting upon the availability of power from that generator at about the time that it was in fact ready for operation. Accordingly, we cannot believe that in shaping its sales policies in 1937, 1938, and the first half of 1939 it was attempting to avoid sales of power that plainly could have been added to its load during that period merely because it feared that such sales might produce a shortage during the last half of 1939. For, with Boulder power, there would be no such shortage, and we are satisfied that petitioner took the availability of such power into account in the formulation of its plans. Whether such power might be charged for bookkeeping purposes to the Metropolitan Water District in order to enable petitioner to obtain it at more favorable rates is a matter of no consequence in this connection. The point is that petitioner had taken effective steps as early as the beginning of 1937 to have its transmission line and its generators constructed, and that in one way or another, it was expecting to obtain Boulder power from its own facilities by the middle of 1939.[12] After a full consideration of all tbe facts developed in this record, both by the direct evidence and the indirect evidence, we are convinced that petitioner did not in fact curtail sales efforts because of any anticipated shortage of power. 8. Although, as we have concluded above, petitioner did not in fact curtail its sales efforts or any sales programs because of any fear of lack of productive capacity or potential productive capacity, there was one occasion when it might have been able to make an unusually large sale of power to the City of Los Angeles beginning in December 1938 if it had then had the additional capacity represented by its Boulder commitment. At the time Los Angeles began to receive Boulder power in 1936 and therefore largely ceased buying wholesale power from petitioner, it leased a 60,000-kilowatt steam plant from petitioner pursuant to a contract with it executed in 1932. ' In November 1937 the City notified petitioner by letter that it would need an additional 100,000 kilowatts of capacity by December 1938. It indicated that it contemplated acquiring such additional capacity through the construction of another transmission line to Boulder , or through the construction of a steam plant. The latter course apparently would have been in violation of the 1932 contract if petitioner had been prepared to furnish the desired power to the City. The City declared in the letter that it was its “understanding that your company would not be in a position to furnish” this additional capacity, and asked petitioner for an assurance that the construction of a steam plant would not violate the terms of the 1932 contract. Petitioner replied that, provided the City continued to lease the 60,000-kilowatt steam plant, no conflict with the 1932 agreement would result if the City built either the Boulder transmission line or a steam plant. The implications of this incident are not entirely clear. Yet, we are satisfied, on the whole, that if petitioner had then been in a position to undertake to sell a block of power of this magnitude it would have done so. A correction under (b) (4) is appropriate for this factor. However, in making the correction, we will have to take into account the fact that the sale of such power would probably have been at wholesale rates, and consequently less profitable than other sales made by petitioner.[13] 4. Apart from the relief that petitioner seeks under (b) (4) by reason of its alleged deliberate failure to take advantage of sales opportunities that actually existed in the base period, it relies also upon potential demand that did not in fact exist during the base period but which, it contends, should be treated as being in existence at that time under a proper application of the push-back rule. The argument made is that petitioner’s increased capacity was derived from construction of Boulder Dam; that Boulder Dam brought additional water and power to southern California; that additional water and power meant expansion of economic activity and demand for electricity in that area; and that a push-back of petitioner’s increased productive capacity requires a push-back as well of Boulder Dam and its additional water and power, together with the asserted higher level of economic activity and increased demand for electric energy. Ordinarily, in the application of the push-back rule, it is only the (b) (4) qualifying change that is pushed back. Thus, the statute contemplates merely that the increased productive facilities are to be considered as having been available 2 years earlier, and the relevant inquiry is whether such new facilities would have resulted in more earnings under the economic and other conditions as they in fact existed during the base period. Cf. National Grinding Wheel Co., 8 T. C. 1278; Green Spring Dairy, Inc., 18 T. C. 217, 240. However, the foregoing is not an inflexible rule, and there may be exceptional situations that justify taking into account certain assumed conditions during the base period as well as the (b) (4) qualifying change itself. This has been recognized by the regulations (section 35.722-3 (d), Regulations 112), and an example given in the Bulletin on Section 722 makes clear the necessity for such exceptional treatment (p. 75) : Certain operating conditions which did not and could not exist throughout the base period may be assumed to exist during such period if these conditions were the basis of the taxpayer’s change or commencement of business and if they constitute normal and essential operating conditions. Thus, for example, suppose a dam was built in January 1939 making a river navigable. Immediately thereafter a corporation was formed to furnish a ferry service across the river. Service began in June of 1939 and continued thereafter. The navigability of the river, made possible by the dam, must be considered one of the normal operating conditions of the corporation. As such, it must be assumed to have been in existence throughout the entire base period. Thus, a condition that is inextricably associated with the qualifying (b) (4) change may, in proper circumstances, be treated as accompanying that change in the application of the push-back rule. Whether the construction of Boulder Dam and all that it implies is such a condition is the question here. We think that it is. The very appropriation of funds for the building of the dam was conditioned upon the Secretary of Interior’s obtaining assurances that the project would be self-liquidating over a period of 50 years. Petitioner was one of the principal allottees of power to be generated, and by its commitment to take such power in its 1930 contract it became in substance one of the underwriters of the project. We agree that the commitment should not be considered in isolation, and that by virtue of its unusual relation to the project both must be considered together, However, our difficulty at this point is that the record before us does not furnish us with any satisfactory guides to determine how much additional demand, if any, there would have been for power during the base period if the project as a whole were pushed back 2 years. The evidence contains many general statements, primarily of a hearsay character, made by persons not available for cross-examination, about the expected role of Boulder Dam in the future development of southern California. Certainly, those statements viewed with optimism and ardor the éffect that the project would have with time. But none of them was related to the question before us, namely, what effect it would have had during the base period if it had been transposed backwards in time pursuant to (b) (4). It may well be that other economic factors during, the base period overshadowed the potential benefits from the project at that time. The evidence fails to show that economic conditions during the base period otherwise were such that additional power and water supplies would have sufficed to induce the considerable rise in activity and demand for electricity contended for by petitioner. The record is just as consistent with the conclusion that there were limiting factors in operation during the base period which might have circumscribed the effect of additional supplies of power and water, and that availability of these supplies would not have materially improved economic conditions and the demand for electric power during-the base period in the area served by petitioner. Whether a substantial increase in migration of population and industry to southern California during the base period would have occurred by reason of a 2-year earlier start on the Boulder project is highly conjectural on the facts before us. We do think, however, that, given two more years, the project might have made itself felt in some degree. We are unable to see how we can do any more than treat it as a “plus” value in the context of this case, and we will therefore give some, but not substantial, weight to this factor in making our final determination. XII Depreciation and Interest — Section 722 (5) (5). Petitioner contends further that its actual base period net income must be corrected for two additional factors which it asserts abnormally reduced its net earnings during the base period. The first of these consists of excessive depreciation deductions; these were taken at rates which respondent subsequently found to be too high, but as to which he was restricted by the statute of limitations in making a retroactive correction, so that correction was made for 1939 by reducing the depreciation for that year but no correction was made for the prior 3 years of the base period, leaving the depreciation for those years in their original excessive amounts. The other deals with deductions for interest on long-term indebtedness which at least in part was retired or refunded before the end of the base period, thereby eliminating the related interest charges and reducing total interest expense. These circumstances are asserted by petitioner to constitute qualifying factors within section T22 (b) (5), under which relief is available if it be shown that the average base period net income is an inadequate standard of normal earnings because “of any other factor affecting the taxpayer’s business” which meets stated requirements. Petitioner argues, moreover, that adjustment must be made for the abnormalities in base period net income introduced by these factors even if they do not themselves qualify under the statute. In this last contention we think petitioner is correct, and we therefore need not determine whether (b) (5) is here satisfied. Since we otherwise find petitioner to be entitled to relief under section 722, it becomes necessary to reconstruct an average base period net income for petitioner as a standard of its normal base period earnings, and' respondent has ruled that on reconstruction all abnormalities are to be corrected which stand in the way of arriving at such normal earnings, without regard to whether they are abnormalities which would provide an independent basis for relief under the statute. Thus, in treating the subject of normal earnings, respondent has declared in E. P. C. 6, 1946—2 C. B. 123, at 125-126: In using base period experience in the determination of normal earnings, it is necessary to take account of abnormalities; i. e., substantial and outstanding departures from the usual and ordinary income and expense that would be expected to characterize tbe profits history of the taxpayer during such a period. Thus appropriate adjustment will be made for all such abnormalities, whether favorable or unfavorable to the taxpayer and whether or not attributable to the qualifying factor. Such adjustment will usually take the form of eliminating, reducing, or increasing items of gross income or deduction. * * * On later consideration of E. P. C. 6, respondent reaffirmed in E. P. C. 13, 1947—1 C. B. 83, at 86, that “Such abnormalities are corrected whether or not they constitute qualifying factors and regardless of whether the consequences are favorable or unfavorable to the taxpayer.” The quoted portion of E. P. C. 6 has been approved by this Court, which has said that it is “sound and in harmony with the statute,” cf. East Texas Theatres, Inc., 19 T. C. 615, 626, and it must be given effect here to the extent that it is applicable. We think that the circumstances as to the depreciation and interest give rise to abnormalities within E. P. C. 6, and that correction must be made for them. 1. The facts as to the depreciation deductions are that, during the four base period years, petitioner took such deductions according to depreciation rates which respondent approved. In June 1943, following consultation between petitioner and respondent, the depreciation rates applicable to many of petitioner’s assets were reduced. The reduced rates were then applied both prospectively to later years, including the taxable years in issue, and retroactively to earlier years, but, because of the statute of limitations, they were given no effect prior to 1939. In other words, petitioner’s depreciation for 1939 was reduced in accordance with the new lower rates, but its depreciation for the years 1936 through 1938 was left unchanged, in accordance with the old higher rates. If the rates applied to 1939 were also used for the earlier base period years, petitioner’s depreciation would be reduced and its net income would be increased by $1,652,184.95 for 1936, $1,666,674.58 for 1937, and $1,685,035.25 for 1938. Respondent does not contend that the new lower rates were in any way improper, or that they were any less appropriate to measure depreciation for 1936 through 1938 than for 1939. Accepting these rates and giving them application for 1939, we are unable to see why a distinction should be drawn between that year and the earlier years, and how normal earnings under section 722 can be determined without also giving those rates effect for the earlier years. Having recognized them as proper for determining normal earnings for 1939, there is no valid reason, so far as a reconstruction under section 722 is concerned, for not acting consistently and using the same rates to determine normal earnings for the earlier 3 years as well. We therefore hold that E. P. C. 6 requires that correction be made here for excessive depreciation. 2. Petitioner’s claim regarding the interest deductions grows out of a reduction in certain interest costs payable on long-term indebtedness which was part of its capital structure during the base period. That claim is divisible into 3 parts. First, between the beginning and the end of the base period petitioner retired, and so reduced, its long-term indebtedness by $31,577,-000. This retirement was made in three different security issues, and during each of the four base period years. At the same time, of course, petitioner reduced the amount of interest payable. Petitioner contends that by the end of the base period its normal earnings consisted of income unreduced by the interest costs thus eliminated; that by the end of that period there had been a reduction in its interest charges and a corresponding increase in its net earnings which must be taken into account in ascertaining its normal basé period earnings as a standard for comparison with earnings during the taxable years in issue; that, unless the reduction in interest costs is reflected in that standard of comparison, earnings attributable solely to these base period interest savings will be improperly taxed as war profits during the years in issue. Keeping in mind E. P. C. 6, we think petitioner’s average base period net income is abnormally low for failure completely to reflect these reduced interest charges, and that this is an abnormality which requires correction. Indeed, in considerable part it resembles in nature one situation dealt with in section 722 (b) (4), which makes eligible for relief a taxpayer which changes the character of its business by effecting “a difference in the ratio of non-borrowed capital to total capital.” The amount of correction suggested by petitioner, however, is too great in that it fails to take into account the fact that the indebtedness and its related interest were being reduced throughout the four base period years, and that therefore there were years in the base period when portions of the indebtedness had already been retired and in which petitioner’s actual earnings reflected the resulting reduction in interest. Correction is needed only to the extent that the actual earnings do not reflect the interest savings. Secondly, in September 1939 petitioner refunded a bond issue in the face amount of $30,000,000, maturing in 1960 and carrying an effective interest charge of about 4 per cent. This issue was replaced by one maturing in 1964, and carrying a lower effective interest charge, with the result that an annual interest expense of about $1,205,074 was reduced to about $927,382, working a saving of about $277,692 in interest per year. To the extent that petitioner’s average base period net income fails to reflect this reduction in interest, we think it likewise contains an abnormality which requires correction under E. P. C. 6 for essentially the same reasons as obtain respecting the retired indebtedness. Respondent argues that the general trend of utility interest rates was in a downward direction during the base period, and that petitioner’s experience in reducing its interest charges spelled normality rather than abnormality. It is nonetheless true that by the end of the base period petitioner had achieved an interest structure which was normal and which was not sufficiently reflected in its actual earnings experience in prior years, making necessary a correction in that experience. Respondent further says that account need be taken of this interest reduction only in so far as there was an actual saving in 1939, which, because the refunding came in September, operated only during the last 4 months of the vear and amounted only to about $92,500 for that year; petitioner argues that the saving should be put on an annual basis, and adjustment should be made according to the amount of saving that could be realized over a full year, $277,692. We believe we must agree with petitioner, if the abnormality is to be completely eliminated. However, even so petitioner is not entitled to a correction of $277,692 in its average base period net income, but to something less, because to some extent that saving is already reflected in its base period net income, since the lower interest charge was operative during the last third of 1939. Only for the remainder of the saving should correction be made. Thirdly, in January 1941 petitioner refunded another of its bond issues. At the end of the base period petitioner had outstanding bonds in the face amount of $108,000,000, which mature in 1960 and on which the effective interest rate was about 4 per cent. In October 1940 a new issue of petitioner’s bonds was sold in the same face amount, but maturing in 1965 and carrying a lower effective interest rate, and on January 1, 1941, the proceeds from the new bonds were used to retire the old ones. Petitioner contends that the resulting interest saving entitles it to some adjustment in its base period income. We cannot agree. Effect cannot be given to this transaction in reconstructing petitioner’s income without relying on events which transpired after 1939, if only to look to whether the refunding took place. To refer to post-1939 events for this purpose, however, is to contravene the prohibition in section 722 (a) that “In determining such constructive average base period net income no regard shall be had to events or conditions * * * occurring or existing after December 31, 1939 * * *." Cf. Alexandria Amusement Corporation, 16 T. C. 446, 455-456; Clinton Carpet Co., 14 T. C. 581, 585-588. And the exception for commitment cases certainly cannot be effective in connection with, alleged abnormalities having nothing whatever to do with the commitment. Petitioner apparently attempts to meet this objection by seeking an adjustment, not amounting to the difference in interest cost achieved in reducing the old interest rate to the new rate actually in effect on the new issue, but in a lesser amount determined by the difference between the old interest rate and the effective rate at which it says the refunding might have been accomplished at the end of 1939. Petitioner asserts that the only reason this refunding was not completed in 1939 rather than in 1941 is that it had to pay a premium on retirement of the old issue, and the premium was considerably higher in 1939 than in 1941. We are not entirely convinced, however, that petitioner could have refunded the $108,000,000 issue in 1939 at the reduced interest rate for which it contends. It must be remembered that petitioner had already refunded its $30,-000,000 issue in 1939, and whether the condition of the market in 1939 was such as to have permitted the absorption of such a large additional refunding issue by the same corporation at that time is a matter on which the record contains no satisfactory evidence. Moreover, even if petitioner could have successfully achieved such a refunding in 1939, the fact is that it did not do so, and we know of no basis upon which we can approve petitioner’s position in this respect. If petitioner had found it advantageous to wait until 1942 or 1943 or 1945, would it be necessary to make some adjustment merely because it might have chosen to act in 1939? We do not read the statute to permit such a result. We come, finally, to the question of the amount of relief to which petitioner is entitled under section 722. Petitioner computed its excess profits credit according to the earnings method. But while a straight average of its base period earnings for the 4 years amounted to about $11,700,000, the credit actually used by petitioner was much higher, amounting to about $14,300,000. This increase of about $2,-500,000 in petitioner’s credit resulted from an application of the “growth formula” of section 713 (f), which reflects increased income experienced by a taxpayer showing a trend of increasing earnings toward the end of its base period. The growth formula accomplishes this result through placing predominant emphasis, in its calculation, on the taxpayer’s last two base period years, and, because many of the abnormalities observed by us to have existed in petitioner’s base period experience were in good part ameliorated by or during those last 2 years, petitioner has already received a substantial measure of relief through application of the growth formula. Thus, depreciation for 1939 has been reduced through use of the new lower rates, and as to the resulting deduction for that year there is now no complaint. By 1938 and 1939, a large portion of the base period retirement of indebtedness had already taken place, and the reduced interest charge flowing from the first of the two refundings discussed above was operative during part of 1939. Repair of the damage done by the loss of the cities’ business was fully achieved no later than about the middle of 1939, so that during 1938 and 1939 petitioner experienced increasing and finally complete correction for that loss. Abnormalities in petitioner’s base period earnings therefore have already been partially corrected through the growth formula. We also recognize that it has been held that where a taxpayer’s credit is increased through the growth formula, it must show, in order to be entitled to relief under section 722, that a proper reconstruction under section 722 of its average base period net income would produce a credit greater than the credit resulting from the growth formula. Irwin B. Schwabe Co., 12 T. C. 606, 613-614; Studio Theatre Inc., 18 T. C. 548, 566. Cf. Stimson Mill Co., 7 T. C. 1065, affirmed, 163 F. 2d 269 (C. A. 9), certiorari denied, 332 U. S. 824; Homer Laughlin, China Co., 7 T. C. 1325; Dowd-Feder, Inc., 10 T. C. 345, affirmed, 178 F. 2d 673 (C. A. 6). However, there has been only partial correction for the abnormalities we have found to be present, and we are satisfied that their complete correction requires adjustment of petitioner’s average base period net income to a level in excess of its credit under the growth formula. Keeping in mind the benefits already derived by petitioner through the growth formula, taking into account all the considerations we have discussed, and giving effect to all the relevant facts and circumstances established by the record, we have concluded that petitioner is entitled to a constructive average base period net income of $1,200,000 in excess of its average base period net income computed without regard to section 722. Reviewed by the Special Division. Decisions will be entered under Rule 50. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (a) General Rule. — In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 81, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income. (b) Taxpayers Using Average Earnings Method. — The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— (1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer, (2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the' case of such industry, * ****** (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the, business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, « * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 81, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31. 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or (5) of any other factor affecting the taxpayer’s business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein. During the year 1936 petitioner sold a total of 567,151,000 kilowatt-liours to the three cities and received revenues aggregating $3,381,122 from them. In the years 1937, 1938, and 1939, such sales accounted for only 53,689,000 kilowatt-hours, 13,299,000 kilowatt-hours, and 44,100,000 kilowatt-hours, respectively, and petitioner received as revenues (including the $575,000 rentals)' from, the cities $991,164, $604,555, and $893,956 in the respective years. It should be noted that the regulations cited above state that the events “contemplated in section 722 (b) (1) consist primarily of physical rather than economic events or circumstances.” (Italics supplied.) The regulations do not limit the provision exclusively to physical events or circumstances. Cf. Alison v. United States, 344 U. S. 167. Cf. Treasury Department Bulletin on section 722 (1944), at p. 11: Physical events such as are contemplated in section'722 (b) (l)i may give rise to economic effects which in turn cause an interruption or diminution of operations. In such cases it may be difficult to- determine whether section 722 (b) (1). or section 722 (b) (2) is applicable. Ordinarily, it will not be necessary to make the distinction, since the taxpayer is entitled to relief in either case, provided the resulting inadequacy of average base period net income is established. See Regulations 112, sections 35.722-3 (a), 35.722-3 (b,; Bulletin on Section 722, pp. 12, 18-19. The general prohibition against resort to post-1939 events was introduced in the House in the bill which became the Revenue Act of 1942 (H. R. 7378, 77th Cong., 2d Sess., sec. 213). The report of the House Ways and Means Committee stated (H. Rept. No. 2333, 77th Cong., 2d Sess., p. 142): In order to eliminate consideration of the effects of the war, it is provided that, in determining the constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, an industry of which it is a member, or taxpayers generally, occurring or existing after December 31, 1989. Thus high war prices, swollen demand, and other factors which would not be normal prior to the imposition of the excess profits tax shall be eliminated in the computation .of the normal or average earning capacity of the taxpayer. The exception for commitment cases was added by the Senate. The Senate Finance Committee’s report, in commenting on this provision, first reads as quoted above, and then merely adds (S. Rept. No. 1631, 77th Cong., 2d Sess., p. 198): Your committee has provided, however, that in those cases described in the last sentence of section 722 (b) (4), relating to taxpayers the change in the character of the business of which accrued after December 31, 1939, * i* * regard shall be had to the change in the character of the business under section 722 (b)| (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income. Moreover, if delays were to be encountered in connection with the completion of its own facilities, the record shows that other sources of power could have been made available to petitioner on an emergency basis, particularly surplus power of the Metropolitan Water District. It is clear that petitioner knew there would be such surplus power at that time and had even considered the means for bringing it into its own distribution system. While we do not suggest that petitioner would have sold power merely upon the expectation of receiving it from such emergency sources, the fact that such sources did exist made it more prudent for petitioner to rely upon obtaining power from its own Boulder facilities by the middle of 1939. Petitioner also seems to suggest, although It is not clear that it insists, that Its base period earnings ought to be increased to reflect anticipated additional wholesale sales to the Pacific Gas and Electric system, a utility which operated in California but outside the southern part of the state. By the end of 1939, petitioner had agreed to supply 75,000 kilowatts a year to P G and E. Thereafter, in April 1940 petitioner contracted to supply P G and E additional power, up to a total of 150,000 kilowatts or 815,000,000 kilowatt-hours per year for 1942 through 1945. Petitioner seems to indicate that correction should be made in base period earnings for the increase in sales provided for in the 1940 contract. In this, we consider petitioner to be clearly wrong, because it seeks improperly to go beyond the base period in ascertaining normal earnings. The situation here is not like that of the City of Los Angeles discussed above ; there is no showing at all that P G and E wanted more power delivered during the base period and that, if petitioner had more productive capacity in the base years, it conld have increased its sales to P G and E during those years. Petitioner’s position is based rather on the contract executed in 1940, and appears to contend for a correction determined according to the terms of that contract. That is prohibited by the statutory injunction against consideration of post-1939 events; while some account may be taken in commitment cases, as we have noted, of events after 1939, the scope of permitted reference is not so broad as to allow what petitioner argues for here. Nor would petitioner be in any better position if it were to rely on its “projective type mechanism” here. The objections on principle to such an approach have already been discussed, supra, pp. 52, 53, 55. Here, moreover, there is an insufficient factual foundation for applying that approach, in that the evidence fails to establish whether there was a reasonable expectation as of the end of 1939 that there would be an increase, or the extent thereof, in sales to P G and B. We are not satisfied on the evidence before us that petitioner and P G and E had come to any understanding before the end of 1939 for the sale of any additional power or that negotiations between them bad progressed to such a point that the consummation of an agreement for the sale of additional power could reasonably be anticipated at that time; moreover, the agreement ultimately reached thereafter was conditional and dependent on approval by the state utilities commission, which might have withheld approval completely or granted It on terms varying from those agreed upon by the parties.