OPINION. Bruce, Judge: At the hearing the petitioner asserted a claim for relief under section 722 (b) (2), (b) (4), and (b) (5).[1] The record contains no facts indicating that petitioner is entitled to relief under section 722 (b) (5) and such section is not mentioned in brief filed by petitioner, and it is assumed that this contention is abandoned. It is petitioner’s contention under section 722 (b) (2) that its business was depressed during the base period by its failure to obtain certain refinancing which it had contemplated, this failure having resulted in its being without adequate working capital which caused an involuntary reduction in inventory. To sustain this contention the burden is upon petitioner to show that its business was depressed by a temporary economic circumstance “unusual in the case of the taxpayer.” Wadley Co., 17 T. C. 269; Lamar Creamery Co., 8 T. C. 928. The facts as established by the record show to our satisfaction that the failure to obtain the refinancing contemplated was not due to any economic circumstance peculiar to the petitioner. The facts, briefly stated, with respect to this circumstance are that the petitioner in 1937 embarked upon a program of expansion and acquired two department stores, one in the Bronx and the other in Newark, New Jersey. The acquisition of these stores was financed by the petitioner from its operating capital and was made at considerable expense. In one of the stores, although it occupied rented premises, extensive repairs and additions were made, including an additional story on the building and escalators. The cost of these improvements was far in excess of what was anticipated by petitioner. It also contracted to acquire a third department store at Jamaica, Long Island, this commitment being conditioned upon its securing a refinancing by a sale of preferred stock of $3,000,000. Of this amount, $350,000 was the estimated underwriting expense and of the balance of $2,650,000, in excess of $1,600,000 was to be used in retirement of outstanding preferred stock and more than $1,000,000 would be obligated for the purchase of the Jamaica store. It will thus be seen that from such financing little, if any, would be left as operating capital to petitioner. We have found that petitioner had no firm understanding with the underwriter with respect to this refinancing, it being entirely contingent upon the condition of the stock market at the time. If the market was down and would not absorb the new issue of stock, the refinancing would not be accomplished. When the time arrived, the stock market was down and due to such fact the issue and sale of the new preferred stock was not possible. Had petitioner possessed a definite contract with the underwriter obligating the latter under any condition to underwrite the new issue of stock and this contract had been breached by the underwriter, the circumstance would have been peculiar to the petitioner. This, however, was not the case, and the circumstance making impossible the issuance and sale of new stock was a depression in the stock market having a general effect of curtailing issue and sale of new stock issues by all corporations. It is our conclusion, in the light of the facts as above detailed, that the failure of petitioner to secure the refinancing it contemplated was not a factor under subsection (b) (2) which would qualify as a temporary economic circumstance unusual in the case of the taxpayer. It is manifest from the record of petitioner’s operations and profits during the base period that things were not well with the business and that it was definitely losing ground, and that this condition was not similar to that of other department stores in the New York City area. However, the record is convincing that this condition was not due to a circumstance external and not subject to control by petitioner but was due primarily to its very unwise business policies together with very severe competition. Petitioner was organized to take over a department store which had been operating in New York City for more than 100 years. It had formerly been very profitable and its owners had been able merchants. Of late years the younger generation in the family of its owners had taken little interest in the business, and matters, in consequence, had gone from bad to worse and for several years prior to its acquisition by petitioner the business had sustained large losses. It was located on 14th Street in New York City in a neighborhood which had been the general location of many of the largest and most prosperous department stores in New York. These stores had moved their location uptown because of the fact that the 14th Street neighborhood had become undesirable. On this street, near the petitioner, were located more than 100 small specialty stores competing directly with the petitioner in sale of men’s and women’s apparel and personal accessories. They were operated at far less expense in selling than was the petitioner and a large portion of their inventory was purchased from receivers of bankrupt establishments or overstocks of merchandise of businesses which were forced to liquidate to obtain additional working capital. These conditions made it possible for these businesses to operate on a much smaller markup in price than petitioner. Another circumstance contributing to the so-called depression in petitioner’s business was the fact that it was operated and its policies determined by the two individuals who had purchased it, together with their attorney. None of these three individuals had any experience in the operation of a department store, which the record shows is a very specialized business requiring a particular type of executive ability. The three individuals in question also devoted only a portion of their time to the operation of petitioner as they possessed many other active business interests. Under such conditions petitioner expanded its business by purchasing two additional department stores and contracting for the purchase of a third. The record shows that the acquisition of the Bronx and Newark stores was little less than disastrous. In addition, petitioner adopted a policy of operation which, the record clearly shows, wise department store operators would never adopt. The first step was the adoption of a “no-profit plan” under which inventory was marked up only to the extent necessary to cover selling costs and expenses. This was widely advertised. Petitioner’s own expert witness characterized this plan as one that in his opinion no sane business would adopt. Following this, it adopted a “share-the-profit plan” which proved unworkable. Following this, it decided upon a reduction in inventory which it claims was involuntary by reason of the fact that the refinancing plan had not gone through. The record does not bear out this claim. The reduction in inventory appears to have been deliberately made as a matter of policy and not because of a lack of operating capital, as petitioner had bank credit available and its owners were men of very large fortunes who, the record indicates, stood ready and willing to advance it any funds it might need. This voluntary reduction in inventory was made at the very time when other department stores were increasing their inventories to the peak in anticipation of the 3 months of October, November, and December, which are the largest sale months in the year for such a business. The business of petitioner consistently declined during the base period, and upon the record as a whole we are convinced that this was due to unwise business management. In Granite Construction Co., 19 T. C. 163, we said: “The statute was not designed to counteract errors of business judgment or to. underwrite unwise business policies,” and in Foskett & Bishop Co., 16 T. C. 156, we said: “the circumstance of poor management cannot be construed to be an economic circumstance * * In fact, we cannot even assume that if the refinancing desired by petitioner had gone through the result would have been a. benefit..to petitioner. It would have entailed acquisition of the Jamaica store which we assume would have been operated with the same lack of judgment experienced in petitioner’s other three stores, in which event petitioner’s troubles might well haye merely increased. For the reasons set out above we are unable to find any proof in the record of a fact or condition justifying petitioner to relief under subsection (b) (2). It is, however, clearly shown to have a factor under subsection (b) (4) in that it changed the character of its business by reason of the acquisition of two additional stores during the base period and later by the elimination of certain large departments in one of these stores and the discontinuance there of credit sales and deliveries. These factors under (b) (4) entitle petitioner to a reconstruction of average base period net income under the 2-year “push-back” rule if it be established that, following the changes, sales and income increased and had not reached by the close of the base period the level that it would have attained had the qualifying changes occurred 2 years earlier. As we said in Southern California Edison Co., 19 T. C. 935: “Certainly, in noncommitment (b) (4) cases it is clear that where increased capacity is the basis for relief the pivotal inquiry is whether such increased capacity would have resulted in increased earnings during the base period. Cf. National Grinding Wheel Co., 8 T. C. 1278; Green Spring Dairy, Inc., 18 T. C. 217; Schneider’s Modern Bakery, Inc., 19 T. C. 763.” Upon the record it appears clear that petitioner has not shown that application of the 2-year “push-back” rule would entitle it to any relief. A reconstruction on such basis would not result in a figure giving relief, as petitioner’s downgrade movement upon its acquisition of the two additional stores would begin 2 years earlier and would not result in a higher level of reconstructed earnings. Petitioner has introduced through an expert witness three reconstructions of base period net income, all of which result in a tremendous increase which would entitle petitioner, if carried into effect, to much larger refunds for the taxable years than are here actually claimed by petitioner. Two of these computations have been made under (b) (2) upon the assumption that the refinancing contemplated had been successful. Although in that case the Jamaica store would have been acquired, such activities as it might have had are not reflected in the computations. In one of the computations petitioner’s witness has attempted to apply the. “push-back” rule. There is statutory provision for application of the so-called 2-year push-back rule for qualifying factors arising under section 722 (b) (4), but no such provision exists for qualifying factors arising under section 722 (b) (2).. In view of our holding that the factors claimed by petitioner under' (b) (2) do not apply, as any depression in petitioner’s business was due to unwise management and severe competition, neither one of which is a qualifying factor, neither one of these reconstructions could be sustained. The third reconstruction was made as under (b) (4), using the “push-back.” For the reasons stated above, however, application of the push-back rule would not result in a figure which would entitle petitioner to any relief. All three of petitioner’s reconstructions appear to be based mainly upon the abstract opinion of the witness that the petitioner would under other circumstances have done differently from what was done and that had such action been taken conditions would have improved and in his opinion would have resulted in large earnings. These reconstructions appear to fall more within the category of “wishful thinking” than ones made upon the basis of the facts actually disclosed by the record. Eespondent has introduced two recomputations of alleged base period net income, each made by an expert highly qualified. In neither computation is the 2-year “push-back” rule reflected, as justification for its application does not exist. Both computations are made upon the basis of the figures established by the record. One of these reconstructions arrives at a constructive average base period net income of $71,700 and the other of $72,000. In both these recom-putations, sales for 1939 were reconstructed and backcast in accordance with E. P. C.’s 42 and 30, to obtain reconstructed sales for 1936, 1937, and 1938. We think these reconstructions are made upon the proper basis. They both arrive at constructive average base period net income in an amount resulting in an excess profits tax credit to petitioner in an amount far less than that to which it was entitled and has been allowed in computation of excess profits tax upon the basis of invested capital. Accordingly, petitioner has not established that the excess profits taxes paid by it for the years in issue are excessive and discriminatory. Reviewed by the Special Division. Decision will be entered for the respondent. SEC. 722. GENERAL RELIEF — OONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (b) Taxpayers using Average Earnings Method. — The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— *•*••*• (2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry. »*»»»** (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did bo, it- shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change In-the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the-ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 81, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 81, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the ■ taxpayer and the competitor existing before January 1, 1940, was eliminated, shall he deemed to be a change on December 31, 1939, in the character of the business, or (5) of any other factor affecting the taxpayer’s business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent; with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.