CLARKSBURG PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35382. Filed May 29, 1957.

*Lawrence R. Lynch, Esq.*, and *Cecil B. Highland, Jr., Esq.*, for the petitioner.

*Arnold I. Weber, Esq.*, for the respondent.

#### OPINION.

MURDOCK, *Judge:* The Commissioner disallowed the claims of the petitioner for relief under section 722 (b) (4) and (b) (5) for the years 1941 through 1945 and has moved to dismiss this proceeding because the petition does not state a cause of action upon which relief could be granted. The parties were heard on the motion and have

filed briefs. The facts alleged in support of each contention are deemed to be admitted for the purpose of the motion and are not in dispute.

The petitioner claims, first, that it qualifies for relief under the following portion of section 722 (b) (4):

any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, * * *

The petitioner was incorporated on July 1, 1927, for the purpose of placing in one corporation the plants, properties, and newspaper publishing businesses theretofore owned and conducted by two separate corporations, the Clarksburg Telegram Company and the Exponent Company. The formation of the petitioner was desired because of the detrimental effect of the competing newspapers and because the Exponent was in poor financial condition. Each corporation assigned to the petitioner in 1927 all of its property and assets with exceptions not here material, and in consideration of those transfers the stock of the petitioner was issued as follows: (a) 1,000 shares of preferred and 1,200 shares of class B common stock to the Exponent Company and (b) 1,000 shares of preferred and 1,800 shares of class A common stock to the stockholders of the Clarksburg Telegram Company. The 1,800 class A shares were issued, 1,656 to Virgil L. Highland, 72 to his brother Cecil B. Highland, and 72 shares to Wilbur E. Morrison.

The Clarksburg Telegram Company was dissolved after the formation of the petitioner. The Exponent Company ceased publishing the newspaper but continued to exist and to hold the stock issued to it.

The transfers were made and the stock was held under a voting trust agreement entered into by the Clarksburg Telegram Company, the Exponent Company, and their principal stockholders, which agreement took effect on July 1, 1927, and was to continue until January 1, 1943, unless sooner terminated by a majority of the holders of each class of common stock.

The voting trust agreement provided that the holders of the class A and class B stocks should have equal control and voice in the general business affairs and management of the petitioner but the separateness of the two newspapers should be maintained insofar as their editorial, political, and news policies were concerned. The petitioner was to have a board of six directors, three representing the holders of trustee certificates for each class of common stock.

Virgil L. Highland died in August 1930, and at that time 568 of his class A common shares of the petitioner were pledged for a debt.

The note evidencing this debt eventually became the property of the Reconstruction Finance Corporation with the collateral attached. The interest on the note was paid to December 30, 1934, but the principal was past due on February 16, 1935, when J. H. Davis, vice president and treasurer of the petitioner and one of its class B stockholders and directors, secretly bought the Highland note with the collateral attached, from the Reconstruction Finance Corporation for $45,360, the amount of principal and interest then due on the note. Davis was acting as agent for the Exponent Company, which supplied the purchase money. He called a meeting of the directors of the Exponent Company on Sunday, February 17, 1935, at which time that company sold to itself at private sale the 568 shares of class A stock held as collateral on the note, for $45,360. Cecil B. Highland, then sole executor and testamentary trustee of the estate of Virgil, was not given any notice of the proposed sale or any opportunity to redeem the stock. He instituted suit the next day in a West Virginia court to redeem the stock, alleging that the purported sale was made in bad faith without notice and an opportunity to redeem the stock and that the stock was worth twice the amount paid for it. He obtained an injunction restraining the transfer of the stock. This litigation created intense bitterness and antagonism between the class A and the class B stockholders.

The trial court held on December 29, 1936, that the purported sale was not made in good faith and set it aside. The Supreme Court of Appeals of West Virginia held on December 7, 1937, that there was no fraud or bad faith on the part of the defendants independent of the price paid for the stock and remanded the case to the trial court to determine whether the price for which the stock was sold, approximately $80 a share, was so grossly inadequate as to indicate bad faith. The trial court then held for the defendants on the basis of the evidence already introduced, but upon appeal, the Supreme Court, on October 24, 1939, required the trial court to afford both parties an opportunity to present additional evidence on the value of the stock. The case was settled by the parties on October 22, 1940, under which settlement Cecil B. Highland, as executor of the Estate of Virgil L. Highland, received the 568 shares in dispute and bought 1,189 $\frac{1}{11}$ shares of class B common stock and 990 $^{10}\!/_{11}$ shares of preferred stock issued to the Exponent Company.

The contention of the petitioner under section 722 (b) (4) is that the petitioner did not acquire substantially all of the assets of the competitor, within the meaning of the portion of section 722 (b) (4) quoted above, until the Estate of Virgil L. Highland acquired a controlling interest in the class B common stock. There is no merit in such a contention. The petitioner, newly created, acquired the assets

of two competing newspapers in 1927 and never thereafter made any further acquisition material hereto. It owned and operated the two newspapers throughout the base period. The quoted provision of section 722 (b) (4) upon which it relies was never intended to apply and by its terms does not apply to such a situation. Thus the petition does not state a cause of action under section 722 (b) (4).

The other contention of the petitioner is based upon section 722 (b) (5) which provides that the excess profits tax without the benefit of section 722 shall be considered to be excessive and discriminatory in the case of a taxpayer such as the petitioner if its average base period net income is an inadequate standard of normal earnings because—

of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

The petitioner, in its petition, summarizes its contention under this provision as follows:

It therefore appears that the factors set forth under this heading, namely, (1) the ruling of the Supreme Court of Appeals on December 7, 1937, with its damaging effect upon the operations, expenses and net income of the Clarksburg Publishing Company by reason of the resulting deliberate attacks upon the corporation's earning power by the officers of an uncontrollable competitor, The Exponent Company, who were serving as Class B directors of the taxpayer, and (2) the existence of an artificial corporate structure forced upon the taxpayer by a preexisting voting trust agreement, whereby a minority interest was given exclusive jurisdiction in some fields of taxpayer's activity and equal jurisdiction in others, were factors affecting the taxpayer's business during the base period, and entitle the taxpayer to the relief requested.

It alleges in support of these contentions that John A. Kennedy, as controlling stockholder of the Exponent Company, began a program, in the latter part of 1937, of increasing the costs of publishing the Exponent; the increased expenses were unrelated to the taxpayer's total business; and they occurred primarily in three general classifications, viz, payrolls, editorial department operating expenses such as features and news services, and free advertising in the Clarksburg Exponent for radio station WBLK, owned by Kennedy, in which the taxpayer had no financial interest. Free advertising for radio station WBLK in the Exponent is alleged to have been $3,375.50 for 1937, $5,825.50 for 1938, and $6,936.66 for 1939. Those are the only figures set forth in the petition relating exclusively to the Exponent. All of the other figures alleged, which relate to the business of the petitioner, are for the petitioner as a whole without any breakdown for each newspaper.

It also alleges in support of the second "factor" relied upon that the taxpayer came into being subject to the inherent vices of dual control which was not created by voluntary or independent corporate action

but was made mandatory by the terms of the voting trust agreement dated June 30, 1927, and therefore the irresponsibility of the management was beyond control of the majority ownership of the taxpayer, with the result that the base period is not an adequate standard of normal earnings. "Normality could exist only after the expiration or earlier termination of the voting trust agreement, at which time ownership and control would coincide and any inefficiency in management would for the first time be taxpayer's own responsibility."

Factor (1) affecting the taxpayer's business during the base period stated in its petition as a basis for relief under section 722 (b) (5) is the ruling of the Supreme Court of Appeals of West Virginia on December 7, 1937. That ruling was in a case in which an estate owning a large block of stock in the petitioner was suing to recover a portion of that stock which had been sold as pledged collateral on a loan. That decision had no effect upon the petitioner's business during the base period years. It did not curtail operations, increase expenses, or reduce net income of the petitioner. The gist of this argument is that "the officers of an uncontrollable competitor, The Exponent Company, who were serving as Class B directors of the taxpayer" made deliberate attacks upon the petitioner's earning power, their purpose being to show that the price paid for the pledged stock was fair. The record clearly shows that the Exponent Company was in no sense a competitor of the petitioner at any time. Its only activity after 1927 was holding one-half of the preferred, all of the class B stock, and later, subject to the litigation, 568 shares of class A stock of the petitioner.

The excess profits net income of the petitioner for the base period years was:

| | |
|---|---|
| 1936 | $93, 357. 68 |
| 1937 | 84, 077. 76 |
| 1938 | 13, 309. 72 |
| 1939 | 18, 900. 21 |

The petitioner does not claim that the decline in its net income for 1938 and 1939 was due to a decrease in gross income although its gross did go down about $50,000 from 1937 to 1939. It is attributed, rather, to an increase in expenditures. Counsel for the petitioner has stated that the only evidence of deliberate attacks by the Exponent group upon the earning power of the petitioner is an inference from the amount of free advertising given to the radio station in the Exponent during three of the base period years and from figures set fourth in the petition which relate to the business of the petitioner as a whole. It refers to the increase of its expenses while gross income was not increasing, the increase in total number of employees which was later reduced, and particularly the increase in the number of employees in the mechanical department despite decreased advertising linage. "The taxpayer believes this to be substantial and

convincing evidence of its averment that such a wastage of money was due to deliberate attacks on its business operations." It also infers from an increase in the nonpayroll editorial department operation expenses that the Exponent wasted money on excessive editorial features and news services.

Factor (2) stated in the petition is "the existence of an artificial corporate structure forced upon the taxpayer by a preexisting voting trust agreement, whereby a minority interest was given exclusive jurisdiction in some fields of taxpayer's activity and equal jurisdiction in others." The petitioner corporation could have no desires, in this connection, different from the desires of those who formed it as expressed in their voting trust agreement. The voting trust agreement was deliberately and voluntarily entered into by those who organized the petitioner and thus it is not helpful to say that that voting trust agreement forced an artificial corporate structure upon the petitioner. It gave the directors elected by the class B stockholders the right to name the editor of the Exponent, to determine its political policies, and to determine what would or would not be published in the paper in that connection, but it did not give them exclusive jurisdiction to any greater extent or in any other field of the taxpayer's activity. The directors elected by the class A stockholders had the same privileges with respect to the Telegram as the directors elected by the class B stockholders had with respect to the Exponent. Each could authorize expenditures within certain areas. The petitioner is a corporation. It had within itself complete jurisdiction in all fields of its activity and shared that jurisdiction with no outsider. The directors of the petitioner, regardless of how they were elected or what particular functions they had within the corporation were, nevertheless, directors of the petitioner, the officers were likewise officers of the petitioner, and everything each did was done on behalf of the petitioner. There is no allegation of any illegal usurpation of authority.

The petitioner throughout refers to its own corporate acts as if they were not its own but as if the class B stockholders were separately operating the Exponent paper and the class A stockholders were the petitioner and as such were operating the Telegram newspaper. The petitioner corporation operated and was responsible for both newspapers at all times during the base period. It cannot be separated into two factions or groups of stockholders for the purposes of this case. The money spent for payrolls, news, and features, as well as for all other purposes, was spent by the petitioner voluntarily for its own benefit and if free advertising was given the radio station, it was given voluntarily by the petitioner. It cannot shed responsibility or blame these acts upon any other person, group, or entity. Thus, accepting its allegations as true for present

purposes, they merely mean that the petitioner now has concluded that it spent some money unwisely during the latter base period years. To allow relief under (5) for unwise expenditures such as these would be inconsistent with the principles underlying the other provisions of subsection (b). *Foskett & Bishop Co.*, 16 T. C. 456, 465–6; *Granite Construction Co.*, 19 T. C. 163, 173; *Pratt & Letchworth Co.*, 21 T. C. 999, 1007; *Hearn Department Stores, Inc.*, 23 T. C. 266, 284 *et seq.*

*Glenshaw Glass Co.*, 23 T. C. 1004, the only decided case giving relief under section 722 (b) (5) is distinguishable in that the royalties reducing base period net income were imposed from without the taxpayer and by the use of fraud.

The Commissioner is right, the petitioner has not stated a cause of action in its petition upon which relief could be granted, therefore a decision will be entered for the respondent that there is no overpayment of excess profits taxes for the taxable years 1941 through 1945.

Reviewed by the Special Division.