PURE TRANSPORTATION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41442. Filed February 18, 1960.

*Marvin K. Collie, Esq.*, and *Frank J. Blaise, C.P.A.*, for the petitioner.

*David H. Nelson, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent disallowed the petitioner's applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939 [1] for the years 1943, 1944, and 1945. For each of the taxable years petitioner's excess profits tax liability, as finally determined by the respondent without the application of section 722, is $174,596.99, $238,469.67, and $142,548.79 for the years 1943, 1944, and 1945, respectively. Petitioner bases its claim for

[4] See *320 East 47th Street Corp.* v. *Commissioner*, 243 F. 2d 894 (C.A. 2), reversing in part 26 T.C. 545.

[1] All section references are to the Internal Revenue Code of 1939

relief on sections 722(b)(2) and 722(b)(4). The questions presented are:

(1) Whether the business of petitioner's "component," Wabash Pipe Line Company, was depressed in the base period because of temporary economic circumstances unusual in the case of such component within the meaning of section 722(b)(2);

(2) Whether the business of petitioner's component, because it commenced business and also made changes in its capacity during the base period, did not reach, by the end of the base period, the earning level it would have reached if it had commenced business or made the change in the character of its business 2 years earlier; and

(3) Whether the petitioner has established that its excess profits tax, computed without the benefit of section 722, is excessive and discriminatory and has established a fair and just amount representing normal earnings to be used as a constructive average base period income.

The facts in this case have been largely stipulated but evidence was presented before a commissioner of this Court and he made proposed findings of fact, which were served upon the parties. Petitioner makes no objections to those findings of fact of the commissioner though it seeks additional findings and respondent makes a few objections to the commissioner's findings of fact and also requests additional findings. The facts as stipulated are now found and the commissioner's findings of fact which are not objected to are now adopted for the purposes of this opinion. Where, in the following summary of our findings of fact, we relate facts objected to or requested by the parties, our inclusion of such facts will be deemed rulings on the objections or requests without specifically noting each such objection or request.

FINDINGS OF FACT.

The Pure Oil Company (hereinafter called Pure Oil) is a corporation which for many years has been engaged in the business of producing, refining, and selling petroleum products. During all of the years here involved, it had refineries at Heath and Toledo, in the State of Ohio, and at Cabin Creek, West Virginia.

Pure Transportation Company (hereinafter sometimes called the petitioner) is a wholly owned subsidiary of Pure Oil, formed in 1934, and engaged in the business of transporting crude oil as a "common carrier" in interstate commerce by pipeline. Its principal office was in Chicago, Illinois, and it filed its income and excess profits tax returns for the taxable years 1943, 1944, and 1945 with the then collector of internal revenue for the first district of Illinois

at Chicago, Illinois. During the years prior to 1941 petitioner's pipelines were located in Michigan, Oklahoma, Texas, and Louisiana.

Early in 1937 new oil fields were discovered in southeastern Illinois and Pure Oil was one of the first producers in this field. Its production in these new fields came from Cisne, Clay City, and Noble Districts, its first well being completed in the Clay City District on March 4, 1937. It owned approximately 80 to 85 per cent of the leasehold interests in these three districts and its estimated recoverable reserves in the three districts on December 31, 1938, and December 31, 1939, were 57,000,000 and 60,000,000 barrels, respectively. Its gross production in barrels from the three districts was 1,856,412 in 1937, 7,411,132 in 1938, and 9,925,527 in 1939.

Pure Oil, in order to provide transportation of the newly discovered oil to its refineries at Heath, Toledo, and Cabin Creek, formed Wabash Pipe Line Company (hereinafter called Wabash) on August 6, 1937. All of Wabash's stock was issued to Pure Oil for cash and Pure Oil advanced cash to Wabash on open account to build a trunk pipeline from Noble, Illinois, to Martinsville, Illinois, a distance of 46.86 miles. At Martinsville, Wabash made connection with the pipeline of the Illinois Pipe Line Company, which was a subsidiary of the Ohio Oil Company and entirely unrelated to petitioner or Pure Oil Company and it served destinations in Ohio, Kentucky, and West Virginia. Prior to building the Wabash pipeline, Pure Oil shipped the oil produced in its Illinois fields by tank car.

The Wabash pipeline was put into operation on or about October 15, 1937. Its initial capacity was about 25,000 barrels a day but, after the installation of additional pumping facilities in 1938, its capacity, after September 1938, was about 35,000 barrels a day or about 12,000,000 barrels a year after allowing for shutdowns and maintenance. Pure Oil owned a gathering system in the oil fields which terminated at the connection to Wabash's trunkline at Noble.

Wabash immediately began transporting crude oil from Pure Oil's Illinois fields to its refineries in Heath, Toledo, and Cabin Creek, and some crude oil for shippers other than Pure Oil. It continued to so transport crude oil for Pure Oil and other shippers until June 30, 1941, on which date it transferred all of its assets to petitioner in consideration for the issuance to it of 2,500 shares of $1-par-value common stock of petitioner, and the assumption of all of Wabash's obligations. Wabash was then liquidated by transferring petitioner's stock so acquired to Pure Oil in exchange for all of Wabash's outstanding stock (1,000 shares) held by Pure Oil. The capital stock was then canceled. Articles of dissolution of Wabash were filed on May 1, 1946.

Petitioner is entitled to compute its excess profits credit for each of the taxable years 1943, 1944, and 1945 under the income method

prescribed in section 713. Petitioner qualifies as an acquiring corporation under section 740(a) of the Code and the Wabash Pipe Line Company, sometimes referred to as Wabash, qualifies as a component corporation under section 740(b), as a result of which, petitioner is entitled to use the average base period net income computed under section 742.

The excess profits net income of the petitioner for each of the taxable years, computed under section 711, is as follows:

| *Year* | *Amount* |
|---|---|
| 1943 | $713,071.25 |
| 1944 | 802,986.45 |
| 1945 | 690,798.33 |

For each of the base period years, petitioner's excess profits net income, computed under section 742, is as follows:

| *Year* | *Net income (or loss)* |
|---|---|
| 1936 | $1,076,783.23 |
| 1937 | 683,698.65 |
| 1938 | (24,777.15) |
| 1939 | (385,593.33) |
| Arithmetic average | 337,527.85 |

For each of the taxable years 1943, 1944, and 1945, petitioner's average base period net income, computed under section 713(e), is $542,407.73 and its excess profits credit computed under section 713(g) is $514,074.59.

Pure Oil's refinery at Cabin Creek was designed essentially to produce lubricating oils from Pennsylvania-type oil and the parties agree the Cabin Creek refinery was an insignificant factor in this case and need not be considered. The amount of crude oil run through Pure Oil's refineries at Heath and Toledo during the base period with the percentage of each year to the 1939 throughput was as follows:

| Year | Heath | Toledo | Total | Percentage of 1939 |
|---|---|---|---|---|
| | *In thousands of barrels* | | | |
| 1936 | 3,542 | 3,435 | 6,977 | 66.95 |
| 1937 | 3,707 | 5,201 | 8,908 | 85.48 |
| 1938 | 4,187 | [1] 2,987 | 7,174 | 68.84 |
| 1939 | 4,099 | 6,322 | 10,421 | 100.00 |

[1] A strike shut down the Toledo refinery from May 13, 1938, to Sept. 24, 1938, which accounted for the reduction in throughput at Toledo for 1938.

The following changes were made in the capacity of Pure Oil's refineries at Heath and Toledo: (a) On November 8, 1937, a new unit was completed at the Heath refinery increasing the plant capacity 1,000 barrels per day, viz, from 10,000 to 11,000 barrels; (b)

on October 8, 1936, a new unit at Toledo increased the plant capacity from 9,500 to 15,500 barrels per day; and (c) on October 20, 1937, a new unit at Toledo increased the plant capacity from 15,500 to 19,000 barrels per day. The Cabin Creek refinery had a capacity of 4,000 barrels daily during the years 1937, 1938, and 1939.

The crude oil turned over to the Illinois Pipe Line Company at Martinsville by Wabash was transferred to other pipelines before reaching its final destination at Heath, Toledo, and Cabin Creek, so that from three to five pipelines shared in the applicable through rate for shipping oil originated by Wabash.

Crude oil pipelines fall into two classes, gathering and trunklines. Gathering lines are small diameter (usually under 4 inches) lines which connect with individual oil wells. A single gathering system may connect with scores or even hundreds of wells. These connections converge into larger lines and ultimately lead to refineries near the fields, to field storage, or tie-in with trunklines. The trunklines (such as Wabash and Illinois) are larger in size (from 6 inches and over in diameter) and ordinarily convey oil over considerable distances. Connecting common carriers, as referred to herein, are pipelines having no direct line connecting point of origin to point of destination and therefore must transfer crude oil from one line to another in order to complete delivery. These connecting carriers file a tariff jointly with the Interstate Commerce Commission showing a through rate per barrel. While through rates from point of origin to point of destination are subject to regulation by the filing of tariffs with the Interstate Commerce Commission, that body exercises no control over the division of the through rates between the participating connecting pipeline carriers. The division of the through rates is settled by negotiation between the connecting carriers. From time to time, as the relative bargaining positions of the carriers changes, their participation in the through rates is changed. Factors considered in negotiating for division of through rates include original cost of the facilities, operating expenses, quantity of oil moved, degree of use of the facilities, profit, competitive conditions, and whether a particular carrier is the originating carrier. Oil pipelines try to run at capacity because such condition increases the profit.

Most of the crude oil transported through the Wabash trunkline was shipped by Pure Oil to its refineries at Heath, Toledo, and Cabin Creek. The tariffs which were in effect to these points during the years 1937 to 1945, inclusive, showing the effective dates of changes and the participating share of petitioner and the other connecting carriers in the rate per barrel, are set forth below:

| Date | Total | Wabash | Other connecting carriers |
|---|---|---|---|
| | *Cents* | | |
| Noble, Illinois, to Heath, Ohio (481.6 miles) | | | |
| Oct. 1, 1937 | 32.25 | 13.59 | 18.66 |
| Nov. 8, 1938 | 26.00 | 5.30 | 20.70 |
| Jan. 1, 1941 | 26.00 | 8.25 | 17.75 |
| Apr. 1, 1941 | 26.00 | 8.76 | 17.24 |
| Jan. 10, 1945 | 23.00 | 5.76 | 17.24 |
| Jan. 1, 1946 | 26.00 | 8.76 | 17.24 |
| Noble, Illinois, to Toledo, Ohio (366 miles) | | | |
| Oct. 1, 1937 | 29.00 | 13.19 | 15.81 |
| Nov. 8, 1938 | 22.00 | 5.40 | 16.60 |
| Jan. 1, 1941 | 22.00 | 8.74 | 13.26 |
| Jan. 10, 1945 | 19.00 | 5.74 | 13.26 |
| Jan. 1, 1946 | 22.00 | 8.74 | 13.26 |
| Noble, Illinois, to Cabin Creek, West Virginia (732.46 miles) | | | |
| Nov. 10, 1937 | 42.00 | 11.38 | 30.62 |
| Dec. 1, 1938 | 35.00 | 4.00 | 31.00 |

No deliveries were made to Cabin Creek after 1940. The average revenue per barrel of oil transported for the account of Pure Oil during the base period years was 7.961 cents.

Wabash transported some crude oil for shippers other than Pure Oil during the base period years. Its proportionate share of the through rates per barrel received during the years 1937 through 1939 on shipments of crude oil for shippers other than Pure Oil was as follows:

| | 1937 | 1938 | 1939 |
|---|---|---|---|
| | *Cents* | | |
| For Indiana Refining Co. | 5.0 | 5.0 | ---------- |
| To: Latonia, Kentucky | 4.5 | 4.5 | 4.0 |
| Lima, Ohio | 4.5 | 4.5 | 4.0 |
| East Sparta, Ohio | 5.75 | 5.75 | ---------- |
| Owensboro, Kentucky | ---------- | 5.75 | 5.75 |
| Bayshore, Ohio | ---------- | 4.0 | 4.0 |
| Cleveland, Ohio | ---------- | 4.0 | 4.0 |

During the period from commencement of operations to the end of 1945, the deliveries through Wabash's trunkline in barrels, gross revenue, and average revenue per barrel, were as follows:

| Year | Shipper | Barrels | Revenue | Average per barrel |
|---|---|---|---|---|
| | | | | *Cents* |
| 1937 | Pure Oil | 620, 241. 44 | $83, 445. 88 | 13. 454 |
| | Others | 364, 290. 67 | 17, 301. 74 | 4. 749 |
| | Total | 984, 532. 11 | 100, 747. 62 | 10. 233 |
| 1938 | Pure Oil | 6, 126, 115. 69 | 713, 212. 98 | 11. 642 |
| | Others | 3. 201. 967. 79 | 156, 185. 67 | 4. 878 |
| | Total | 9, 328, 083. 48 | 869, 398. 65 | 9. 320 |
| 1939 | Pure Oil | 10, 022, 354. 22 | 538, 278. 12 | 5. 371 |
| | Others | 1, 005, 016. 99 | 40, 523. 26 | 4. 032 |
| | Total | 11, 027, 371. 21 | 578, 801. 38 | 5. 249 |
| | Base period totals | 21, 339, 986. 80 | 1, 548, 947. 65 | 7. 258 |
| 1940 | Pure Oil | 11, 582, 729. 55 | 619, 545. 39 | 5. 349 |
| 1941 | Pure Oil | 11, 891, 371. 23 | 1, 034, 543. 15 | 8. 700 |
| 1942 | Pure Oil | 9, 675, 709. 89 | 846, 340. 66 | 8. 747 |
| 1943 | Pure Oil | 8, 110, 251. 39 | 709, 528. 02 | 8. 749 |
| 1944 | Pure Oil | 10, 083, 017. 12 | 881, 999. 22 | 8. 747 |
| | Others | 74, 903. 98 | 6, 546. 61 | 8. 740 |
| | 1944 total | 10, 157, 921. 10 | 888, 545. 83 | 8. 752 |
| 1945 | Pure Oil | 9, 849, 525. 31 | 573, 393. 55 | 5. 822 |
| | 1940–1945 totals | 61, 267, 508. 47 | 4, 671, 896. 60 | 7. 625 |

The following table shows Wabash's total shipments of crude oil in barrels in 1937 through 1939 with a breakdown by destinations (round figures):

Destined to Pure Oil Refineries

| Year | Shipments | Heath | Toledo | Cabin Creek | Others |
|---|---|---|---|---|---|
| | (*Barrels*) | | | | |
| 1937 | 984, 532 | 415, 348 | 203, 494 | 1, 400 | 364, 290 |
| 1938 | 9, 328, 083 | 2, 659, 234 | 3, 166, 409 | 300, 472 | 3, 201, 968 |
| 1939 | 11, 027, 371 | 2, 842, 674 | 7, 085, 180 | 94, 500 | 1, 005, 017 |

For the base period years, petitioner's gross receipts and net profit (or loss) were as follows (cents omitted):

| *Year* | *Gross receipts* | *Net profit (or loss)* |
|---|---|---|
| 1936 | $4, 025, 394 | $1, 072, 817 |
| 1937 | 3, 391, 704 | 415, 418 |
| 1938 | 2, 216, 407 | (616, 511) |
| 1939 | 2, 012, 976 | (642, 603) |

For the period August 6 to December 31, 1937, and the calendar years 1938 and 1939, Wabash's gross receipts and net profits (cents omitted) were as follows:

| *Period or year* | *Gross receipts* | *Net profit* |
|---|---|---|
| Aug. 6 to Dec. 31, 1937 | $101, 906 | $57, 331 |
| 1938 | 871, 278 | 641, 449 |
| 1939 | 578, 801 | 257, 010 |

The Interstate Commerce Commission's annual report, "Statistics of Oil Pipe Line Companies," furnishes a summary of operations as follows:

| Year | Miles of line operated | Investment in pipelines | Operating revenues | Operating expenses | Operating income | Net income |
|---|---|---|---|---|---|---|
| | | *(In thousands of dollars)* | | | | |
| 1935 | 92,037 | $763,009 | $197,368 | $89,364 | $79,586 | $78,249 |
| 1936 | 94,060 | 773,743 | 219,057 | 92,899 | 94,491 | 91,742 |
| 1937 | 96,611 | 802,946 | 248,198 | 99,641 | 109,994 | 102,720 |
| 1938 | 95,775 | 807,657 | 228,211 | 98,756 | 95,128 | 92,724 |
| 1939 | 98,681 | 829,646 | 212,466 | 97,130 | 83,401 | 80,823 |
| 1940 | 100,156 | 841,977 | 225,760 | 101,919 | 82,558 | 79,857 |
| 1941 | 105,435 | 885,317 | 251,685 | 110,448 | 81,604 | 79,468 |

During the years 1936 to 1941, inclusive, petitioner transported annually through its gathering pipeline and trunk (including Wabash) pipelines, the following amounts of crude oil (barrels):

| Year | Gathering lines | Trunklines | Total |
|---|---|---|---|
| | *(Barrels)* | | |
| 1936 | 26,857,660.10 | 16,334,016.17 | 43,191,682.27 |
| 1937 | 27,274,238.07 | 12,516,523.16 | 39,790,761.23 |
| 1938 | 15,346,483.08 | 20,480,364.57 | 35,826,847.65 |
| 1939 | 12,693,964.79 | 23,786,125.43 | 36,480,090.22 |
| 1940 | 11,542,837.14 | 25,378,608.30 | 36,921,445.44 |
| 1941 | 12,749,083.91 | 28,644,662.18 | 41,393,746.09 |

Aggregate revenues in dollars from the foregoing shipments were:

| Year | Gathering lines | Trunklines | Total |
|---|---|---|---|
| 1936 | $2,003,804.59 | $1,820,752.09 | $3,824,556.68 |
| 1937 | 2,023,183.97 | 1,210,430.08 | 3,233,614.05 |
| 1938 | 1,126,728.50 | 1,795,583.42 | 2,922,311.92 |
| 1939 | 729,741.82 | 1,755,372.31 | 2,485,114.13 |
| 1940 | 720,583.67 | 1,818,966.44 | 2,539,550.11 |
| 1941 | 807,259.93 | 2,280,286.98 | 3,087,546.91 |

Prior to discovery of the Illinois fields, Pure Oil's Toledo refinery obtained crude oil from both the Michigan and the Mid-Continent fields and its Heath refinery obtained crude from the Mid-Continent fields. The Mid-Continent oil fields were in Kansas, Oklahoma, New Mexico, Texas, Louisiana, and Arkansas. By 1938 and 1939 the Illinois crude had largely displaced the Mid-Continent crude at the Heath and Toledo refineries. Michigan crude was displaced by Illinois crude at the Toledo refinery in or about 1937.

In 1937 the pipeline of the Illinois Pipe Line Company, with which Wabash connected at Martinsville, was not being fully utilized. In addition, Illinois had a large tank farm and other connecting facilities at the Martinsville junction, which influenced Wabash in connecting with Illinois at Martinsville. At that time, Wabash was the only trunkline connecting the new Illinois oil

fields to an existing trunkline. These and other factors enabled Wabash to secure a substantial participation in the first through rates established for moving Illinois crude by pipeline from Noble, Illinois, to Pure Oil's refineries.

In 1938 the Louden oil field was discovered in southern Illinois. Pure Oil had no production in the Louden field or the Salem field which was south of the Louden development. The pipeline of the Illinois Pipe Line Company ran directly through the Louden field, and, as a result, a large amount of crude became immediately available to Illinois as the originating carrier. Illinois brought to Wabash's attention the increased use of its pipeline in transporting crude oil from the Louden field, and insisted on a reallocation of the through rate between the participating carriers. Late in 1938, the amount of Wabash's participation in the through rates from Noble, Illinois, to Pure Oil's refineries was reduced. At that time, Wabash expected additional pipelines to be built due to the discovery and development of the southern Illinois oil fields, and, in addition, it would have been very expensive to erect the necessary tankage and other facilities needed to connect Wabash with some other trunk pipeline.

During 1937, Sohio Pipe Line Company, a subsidiary of Standard Oil Company of Ohio, entirely unrelated to petitioner, Pure Oil, or Wabash, referred to herein as Sohio, operated several short pipelines in the new oil fields. In July 1939, Sohio purchased from Tidewater Pipe Line Company, Ltd., the latter's 6-inch trunk line which extended from Stoy, Illinois, to a point just beyond the Ohio-Pennsylvania State line. In November 1939, Sohio completed a 10-inch westward extension of this line from Stoy, Illinois, through Olney, Flora, and thence to Salem, Illinois. This 10-inch extension intersected Wabash's pipeline about 1 mile north of its starting point at Noble. In December 1939, Sohio started a 12-inch line to replace the 6-inch line from Stoy, Illinois, to Lima, Ohio. The replacement was completed in April 1940.

In 1937 and 1938, Wabash transported 171,653 and 1,092,437 barrels of crude oil, respectively, to Lawrenceville, Illinois, from the Indiana Division of the Texas Company. Wabash delivered the crude oil to the Texas Company by means of a connection with the pipeline facilities of Texas Empire Pipe Line Company, whose pipeline terminated at Lawrenceville. The connection was located approximately 32 miles north of Noble, or about two-thirds of the way from Noble to Martinsville. After 1938 Wabash ceased transporting oil to Lawrenceville as the Texas Company caused a pipeline to be built from the Salem oil fields to Lawrenceville. This pipeline ran near to or through Noble, Illinois, the originating point of Wabash's trunkline.

Effective January 1, 1941, which was after these additional pipelines in the southern Illinois oil fields had been completed, *Wabash* received a larger percentage of the through rates than it had received between November 8, 1938, and January 1, 1941.

Petitioner's business was not depressed in the base period because of temporary economic circumstances within the meaning of section 722(b)(2).

Petitioner's average base period net income is not an inadequate standard of petitioner's normal earnings.

OPINION.

Petitioner seeks relief from excess profits tax under sections 722(b)(2) and 722(b)(4). Petitioner is entitled to use the excess profits credit based on income. Sec. 713. For each of the years 1943, 1944, and 1945 its average base period net income computed under section 713(e) is $542,407.73, and its excess profits credit computed under section 713(g) is $514,074.59. Petitioner contends that its average base period net income is an inadequate standard of normal earnings because (1) the business of Wabash, its component corporation, was depressed during the base period years, within the meaning of section 722(b)(2), by a purported monopoly exerted by Illinois Pipe Line, a connecting carrier that linked Wabash with the ultimate market for the crude oil, and (2) because Wabash commenced business and also changed the character of its business, within the meaning of section 722(b)(4), and that it did not reach an earning level which it would have reached if it had commenced business or made the change in the character of its business 2 years before it did so. Petitioner offered in evidence three separate reconstructions of its base period income and, on brief, contends that a constructive average base period net income of $639,-228.07 should be adopted.[2] It is the petitioner's position that the reconstruction proposed by it "is proper under section 722(b)(4) as well as under section 722(b)(2)."

Petitioner, as an acquiring corporation, was entitled to compute its average base period net income for the years 1943, 1944, and 1945 under Supplement A (section 742), which provides that an acquiring corporation may include the income of its component in arriving at the average base period net income. Petitioner included Wabash's income in making this computation. It is stipulated that the average base period net income, combining the base period net incomes of petitioner and its component, is $542,407.73. Section

[2] This CABPNI appears in Exhibit 17. In Exhibits 18 and 19 the petitioner computes a CABPNI of $588,219.30 and $561,606.03, respectively. The three computations are identical except for one item, "Reconstructed Net Income per Barrel," which appears as *$0.0796, $0.075 and $0.0726 in Exhibits 17, 18, and 19, respectively.*

722(e)(2) provides that for the purposes of section 722 "a taxpayer, the average base period net income of which is computed under Supplement A, for the period for which the income of any other person is included in the computation of the average base period net income of the taxpayer, the taxpayer shall be treated as if such other person's business were a part of the business of the taxpayer."

In *Irwin B. Schwabe Co.*, 12 T.C. 606, 613, this Court said that where "the income of the [component corporation] is included with the income of the [acquiring corporation] in computing the average base period net income, the [acquiring corporation] is to be treated as if the business of the [component corporation] during that period had been a part of the business of the [acquiring corporation]." It is clear, therefore, that for the purpose of deciding whether petitioner is entitled to relief under section 722 we must treat Wabash as a segment of petitioner's business during the base period years.

Petitioner states on brief that "No claim for reconstruction was made on behalf of the Pure Transportation income in the base period; the claim was only with respect to Wabash, the component corporation." It is petitioner's position throughout that it is "entitled to have its constructive average base period net income reconstructed by using the actual base period net income of Pure Transportation and adding thereto the reconstructed base period net income of Wabash." Petitioner insisted throughout the trial that this Court was not to look at the petitioner's own operations during the base period, apart from accepting its actual average base period net income, but that we must concentrate solely on a reconstruction of Wabash's activities.

Respondent argues the requirement of section 722(e)(2) means one business composed of petitioner and Wabash must be considered and as he states on brief, "Having once postulated a hypothetical business consisting of two segments (Pure Transportation and Wabash), we may then go on to consider whether *this* business was depressed, or commenced, or changed character, during the base period, and whether the excess profits credit of petitioner resulted in an excessive and discriminatory excess profits tax."

We think respondent is right. Under the fact stipulation before us, we do not see how the two can be segregated. Even from the meager evidence that we have concerning petitioner's own operations during the base period years, it is evident that its operations were adversely affected by Wabash. Both petitioner and Wabash were subsidiaries of Pure Oil during the base period, and the crude oil carried by each was destined, for the most part, to the parent's two refineries in Ohio (Toledo and Heath). Petitioner's own pipelines were located in Michigan, Oklahoma, Texas, Louisiana, and Illinois, and prior to the discovery of the Illinois fields, Pure Oil's

Toledo refinery obtained its crude oil from both the Michigan and the Mid-Continent fields and its Heath refinery obtained crude from the Mid-Continent fields. In 1937 the new Illinois fields were discovered, and the crude oil from these fields was very good from the standpoint of the refineries in that it had a low sulphur content and could be refined with minimum corrosion to the refinery equipment. It also produced better petroleum products than oil from other fields then in use. Wabash was formed by Pure Oil on August 6, 1937, to transport this newly discovered Illinois crude oil to the Heath and Toledo refineries. In that same year, the Illinois crude oil replaced Michigan crude at the Toledo refinery, and by 1938 and 1939 the Illinois crude had largely displaced the Mid-Continent crude at the Heath and Toledo refineries. It is readily apparent that the rise in Wabash's fortunes was matched by a corresponding decline in petitioner's. This is graphically portrayed by a comparison of the base period net profit (or loss) of Wabash and the petitioner:

| | *Petitioner* | *Wabash* |
|---|---|---|
| 1936 | $1,072,817 | [1] |
| 1937 | 415,418 | [2] $268,279 |
| 1938 | (666,227) | 641,449 |
| 1939 | (642,603) | 257,010 |

[1] Not yet operating.
[2] Approximately 3 months.

We think that petitioner's failure to include its own experience in a reconstruction of the base period is fatal to its claim for relief. This is so because under section 722(a) an applicant for excess profits tax relief must not only establish that the excess profits tax, computed without the benefit of section 722, is excessive and discriminatory, but it must also establish "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income." *Norfolk & Chesapeake Coal Co.*, 18 T.C. 904. Petitioner fails to recognize that it must show that *its* business, composed of *both* segments, was depressed during the base period under section 722(b)(2) and that *its* business operations, again composed of both segments, does not reflect the normal operation for the entire base period of *its* business within the meaning of section 722(b)(4). In other words, when petitioner has the duty to establish a "fair and just amount" representing normal base period earnings, it must do so for its whole business which consists of two segments. Sec. 722(e). In *A. B. Frank Co.*, 19 T.C. 174, affd. 211 F. 2d 497, the taxpayer sold dry goods and appliances through separate departments. Claiming that its dry goods segment was depressed during the base period, the taxpayer sought to reconstruct this segment alone. This Court, in rejecting such an approach,

emphasized that a taxpayer seeking 722 relief must treat his business as a whole. We said, at page 182:

> During and prior to the base period the petitioner's business consisted of wholesaling dry goods and appliances. In the determination of whether this business was depressed, we must look *at the entire business* and not merely one segment of it. The petitioner's business consisted of the sale of many different types of merchandise, and appliances cannot be set apart from the rest. * * * It is our conclusion that although the dry goods sales may have been depressed, the capital released from this line of merchandise was devoted to the sale of appliances which prospered sufficiently to prevent any depression in the taxpayer's business. We are of the opinion that petitioner's business as an entity was not depressed during the base period and for this fundamental reason relief cannot be granted under the terms of section 722(b)(2), I.R.C. [Emphasis added.]

We do not believe that petitioner has established this "fair and just amount" by reconstructing only the Wabash segment of the base period operations. As this Court pointed out in *Godfrey Food Co.*, 18 T.C. 1083, 1089, "Any proper reconstruction of normal operations for the base period must necessarily embrace all of [the taxpayer's] business." Petitioner has simply failed to present this Court with a reconstruction of the base period earnings of both segments and without such proof we must hold against the petitioner. Obviously, a mere arithmetical addition of Wabash's *reconstructed* base period earnings to petitioner's actual base period earnings will not suffice. The interrelation of these two segments makes it vital to reconstruct one as well as the other. A reconstruction of Wabash is meaningless and erroneous unless it takes into account the effect of such reconstruction on the petitioner.

Even if we examine on their merits the various grounds for excess profits tax relief put forth by the petitioner under sections 722(b)(2) and 722(b)(4), we must conclude that the petitioner is not entitled to any relief. Petitioner claims it is entitled to relief under section 722(b)(2) because Illinois Pipe Line, which connected Wabash with the Pure Oil refineries, exercised a monopoly over Wabash during the last part of the base period. As a consequence of this monopoly, the argument runs, Illinois Pipe Line forced Wabash to accept an unusually low participation rate, which depressed Wabash's earnings within the meaning of section 722(b)(2). Wabash originated its crude oil movement at Noble, Illinois, and turned it over to Illinois Pipe Line at Martinsville, Illinois, approximately 47 miles away. The distances from Martinsville to Pure Oil's refineries at Heath and Toledo were approximately 435 miles and 320 miles, respectively. Through rates from point of origin to point of destination are filed jointly by connecting carriers with the Interstate Commerce Commission, but that agency exercises no control over the division of the through rate between the connecting carriers. This division is settled by private negotia-

tion, and the participating rate of each connecting carrier depends upon its relative bargaining position. Factors considered in dividing the through rate include original cost of the facilities, their degree of use, operating expenses, quantity of oil moved, profit, competitive conditions, and whether a particular carrier is the originating carrier.

When Wabash started operating in October 1937 the total rate from Noble to the Toledo refineries was $0.29 per barrel, and Wabash's share of this was $0.1319 per barrel. For about 13 per cent of the shipping distance Wabash received about 45 per cent of the through rate. In November 1938 the through rate was revised downward to $0.22 per barrel, and at this time Wabash's participation was reduced to $0.054 per barrel, or about 25 per cent of the total through rate.[3] A summary of Wabash's throughput in barrels, its gross revenues, net income and per cent of net profits to revenues during the base period is as follows:

| | *Oct.-Dec. 1937* | *1938* | *1939* |
|---|---|---|---|
| Throughput (bbls.) | 984, 532 | 9, 328, 083 | 11, 027, 371 |
| Gross revenues | $101, 906 | $871, 278 | $578, 801 |
| Net income | $57, 331 | $641, 449 | $257, 010 |
| Per cent of net profit to gross revenues | 56. 3 | 73. 6 | 44. 4 |

Petitioner claims that Wabash was depressed from November 1938 through all of 1939 because of the reduction in its participation rate, which reduction the petitioner blames on the purported monopoly exercised by Illinois Pipe Line.

At the outset we find it difficult to say that Wabash was depressed when it was earning a net income which approximated 44 per cent of its gross revenues. Moreover, "Statistics of Oil Pipe Line Companies" in the annual report of the Interstate Commerce Commission show that the per cent of operating income to operating revenues of such companies in 1939 was about 40 per cent. Petitioner, therefore, cannot say that Wabash was depressed in the context of the industry. We think it is strongly suggested from the evidence that Wabash's participation rate in 1937 and during most of 1938 was unusually high because of its enviable position as an originating carrier in the newly discovered Illinois fields and, further, because it was the first carrier in that area. An officer of the petitioner testified that "in 1938 there were no other outlets in that area, other than the Wabash Pipe Line Company. We were the sole movers of crude as developed in that area, originating on our line for delivery to Illinois Pipe eastward." It is quite evident that these two factors alone would give Wabash a strong bargaining posi-

[3] The through rates and the participation rates with respect to the Heath refineries are similar in nature and they are omitted here since they do not add anything to the above analysis.

tion with any connecting carrier. It is also very significant that in 1937 and 1938, when Wabash was able to bargain for such a high participating rate, Illinois Pipe Line was the only connection open to Wabash to get its crude oil to the Heath and Toledo refineries. It is difficult to understand how Illinois Pipe Line could be called a monopoly in 1939 when, under similar conditions, it wasn't a monopoly in 1937 and 1938. Petitioner gives no satisfactory explanation as to why Wabash was able to extract such a high participation rate from a "monopoly" in one year and then lose some of its advantage at the bargaining table in the next year.

We think that the change in the participation rate was nothing more than a result of the operation of competitive forces in this area. There are indications that other pipelines came into this area and that Wabash would have to compete with them. The evidence also shows that the volume carried by Wabash increased tremendously from 984,532 barrels in 1937 to 9,328,083 barrels in 1938, and then to 11,027,371 barrels in 1939. Since the quantity of oil moved is one of the factors considered in the negotiation of participation rates, it is conceivable that a rate which would have been a fair one when Wabash put 984,532 barrels into the Illinois Pipe Line became unfair and onerous when that volume rose to more than 9,000,000 barrels. There is still another explanation of the rate adjustment in 1938. In that year the Louden oil field was discovered in southern Illinois, some distance west of Martinsville (the Wabash-Illinois Pipe Line connecting point). Pure Oil had no production in the Louden field. Illinois Pipe Line ran directly through this field and a large amount of crude oil became immediately available to Illinois as the originating carrier. Illinois Pipe Line, as a result of this change in its bargaining position, insisted on a reallocation of the through rate with Wabash. It thus is apparent, from the above discussion, that the reduced participation rate of Wabash in 1938 and 1939 was caused by the constant interplay of competitive forces. In *Lamar Creamery Co.*, 8 T.C. 928, this Court held that competition cannot be considered a temporary economic circumstance within the meaning of section 722(b)(2), that competition is present in almost any business and that instead of competition being something unusual, it is quite common. What we said in the *Lamar* case is equally applicable here. Any reduction in Wabash's participation rate in 1938 and 1939 was not caused by any purported monopoly, but by the normal action of competitive forces. We hold, therefore, that petitioner has not established any right to excess profits relief under section 722(b)(2).

Another reason for denying petitioner relief under section 722(b)(2) is its failure to establish a "fair and just amount representing normal earnings to be used as a constructive average base period net

income." Sec. 722(a). Petitioner submitted three different reconstructions of Wabash's base period income and each of them was the 2-year push-back rule. Petitioner contends that these reconstructions (see footnote 2, *supra*), are "proper under section 722(b)(4) as well as under section 722(b)(2)." Petitioner is mistaken, since it is clear under the statutory scheme that the 2-year push-back rule does not apply to situations which arise under section 722(b)(2). *Hearn Department Stores, Inc.*, 23 T.C. 266, 287. In addition to this, the petitioner has failed to show in its reconstruction that its *entire* business, rather than just Wabash, was depressed during the base period. See *A. B. Frank Co.*, *supra*.

Petitioner also claims excess profits tax relief under section 722(b)(4). Wabash commenced business and also increased its capacity during the base period, but these are merely qualifying factors and they do no more than to entitle petitioner to further consideration for relief. *Calvert Iron Works, Inc.*, 26 T.C. 770. Section 722(b)(4) provides that if "the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business 2 years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time." There is nothing in the record to support petitioner's argument that if Wabash had commenced operations, or changed its capacity 2 years earlier, it would have reached a higher level of earnings by the end of the base period than it actually did. In 1939, and for a few months prior to 1939, Wabash had a sufficient capacity to move about 12,400,000 barrels of crude oil annually, and, allowing for normal shutdowns for repairs and adjustments, the annual capacity was about 12,000,000 barrels. There was evidence that pipelines are most efficient when they are operated at capacity. But during 1939 the petitioner carried no more than 11,027,371 barrels of crude oil, a little less than 1,000,000 barrels of its full capacity.[4] Wabash was formed by Pure Oil for the purpose of providing transportation of the newly discovered Illinois Oil to the Pure Oil refineries at Heath, Toledo, and Cabin Creek.[5] The combined annual capacities in 1939 of Pure Oil's Heath and Toledo refineries exceeded 14,000,000 barrels of crude oil. This figure was described by petitioner's witness as an "efficient throughput" for the refineries. He pointed out this was "not necessarily the maximum" but was a "comfortable throughput" for the refineries as they existed at that time. Yet, with an annual capacity in 1939 exceeding

4 Of this total, 10,022,354 barrels were carried for Pure Oil and the balance, or 1,005,016 barrels were carried for others.

5 Petitioner and respondent agree that the Cabin Creek refinery is not a significant factor in this case and, consequently, we have not discussed it in the course of this opinion.

14,000,000 barrels, Pure Oil's two refineries processed only 10,421,000 barrels in that year. Most of this, as we have seen, came through Wabash. There is no evidence of any shortage of Illinois crude oil in 1939. There is no evidence to show that companies other than Pure Oil were clamoring for crude oil for their refineries to be carried by Wabash. In fact, the evidence reveals a marked decline during the base period years of crude oil carried by Wabash for others than its parent, Pure Oil.

It is quite evident that capacity was not a limiting factor on Wabash's earnings during the base period years, and, therefore, the 2-year push-back would be of no avail to Wabash under base period conditions. *National Grinding Wheel Co.*, 8 T.C. 1278; *Rocky Mountain Pipe Line Co.*, 26 T.C. 1087. We do not believe that if Wabash's changes in capacity took place 2 years earlier that it would have changed Wabash's throughput. Nor is there anything in the record to show that if Wabash had commenced business 2 years earlier, its earnings during the base period would have been different. We think that the situation here is closely analogous to that in *Rocky Mountain Pipe Line Co.*, *supra*, where we said:

> The evidence is that at the end of 1939 there were ample oil reserves in the Lance Creek field and that the refineries which petitioner's pipeline served had sufficient capacity to handle all of the oil petitioner could transport. However, the volume of petitioner's business depended, we think, on two principal factors, the production at Lance Creek and the demands of the refineries for crude oil. Undoubtedly, these factors depended to a great extent on the prevailing prices for crude oil and refined oil products. We do not know what these prices were during the base period years. There is no question that the producers and the refineries were capable of stepping up production to meet the demands on the industry whenever prices for oil products were favorable.

In this case, Wabash was controlled by Pure Oil during the base period, and Wabash's activities were geared, for the most part, to the needs of Pure Oil. We are told nothing of Pure Oil's demands for crude oil, or the market for Pure Oil's product from the refineries during the base years. This is crucial here, since it was to serve Pure Oil's needs that Wabash was formed. We are not convinced that if Wabash had commenced business, or changed its capacity 2 years earlier, Pure Oil would have increased the capacity of its refineries more than it did. See *Rocky Mountain Pipe Line Co.*, *supra* at 1095. As the record shows, Pure Oil did not have sufficient need for Wabash's services to utilize the full capacity of the pipeline.

Nor can we accept petitioner's reconstruction of Wabash's base period earnings, even if we were to find that the 2-year push-back rule applies. In each of the three reconstructions made by the petitioner, it moved Wabash's *actual* crude oil throughput for 1938 and

1939 back to the years 1936 and 1937, respectively, and then made the assumption that Wabash operated at a full annual capacity of about 12,000,000 barrels through 1938 and 1939. In *Green Spring Dairy, Inc.*, 18 T.C. 217, this Court held that such an approach was erroneous, and we said at page 240:

> A basic fallacy in petitioner's position is the premise that in applying the push-back rule we must assume not only that the new plant was constructed in 1935 rather than in 1937, but also that the new plant commenced business in 1935 with the level of sales that was in fact reached in 1937 when the plant actually began operation. The latter assumption does violence to the theory of the push-back rule. We are required to assume merely that the (b)(4) "change" occurred 2 years earlier. In the context of this case, this means only that we are to assume that the new plant was constructed in 1935 rather than in 1937. The new plant is superimposed upon conditions as they existed in 1935 including the then level of sales. * * * Under petitioner's theory, the 2-year growth actually attained by it as of September 1937, when the new plant was opened, would be treated as having been achieved in September 1935 and used as a starting point for computing hypothetical growth from September 1935, thus enabling it artificially to pyramid growth upon growth. We think that no such extraordinary result was ever intended by the statute, and its plain language indicates otherwise.

Another fault in the reconstructions is that they fail to take into consideration the adverse effect that any increase in Wabash's operations would have on petitioner's own operations. Simply adding a *reconstructed* base period earnings figure for Wabash to the *actual* base period earnings of the petitioner is incorrect. We have discussed this earlier in the opinion and need not repeat it here. Lastly, we think that the use in the reconstructions of an *average* rate per barrel of crude oil is incorrect. Petitioner's three reconstructions differ only in the use of this rate. The reconstruction which petitioner contends is correct is the one that appears in Exhibit 17, and it uses a rate of $0.0796 per barrel, which is described as the "average rate during base period for deliveries for account of Pure." This exhibit shows a constructive average base period net income of $639,228.07 and an excess profits credit of $606,053.92. The average rate used by petitioner includes the early years of Wabash's operation when it was the sole originating carrier in the new Illinois fields. Its participation rate, as we have seen, was quite high. But when conditions matured and competitive forces began to operate, there was a downward readjustment of Wabash's participation rate. If we are asked to assume that all events took place 2 years earlier, then we must be shown a reconstruction of the base period on the basis of a business which had matured by the end of such period and whose earnings had reached what might be called a more "normal" level. We do not think this is achieved by the petitioner's use of an average rate.

We hold, on the basis of the entire record, that petitioner is not entitled to excess profits tax relief under section 722(b)(2) or section 722(b)(4).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*